TRUJILLO & TRUJILLO, APLC
Robert Trujillo, Esq. (CA SBN 148975)
Melody Trujillo, Esq. (CA SBN 165218)
41593 Winchester Road, Suite 201
Temecula, CA 92590
Tel:  951-296-9529
Email:  trulaw@trujillo-law.us

Suzanne Skolnick, Esq. (CA SBN 211076)
2888 Loker Avenue East, Suite 110-F
Carlsbad, CA  92010
Tel: 760-405-4397
Email:  suzanne@skolnicklawgroup.com

Lewis Khashan, Esq. (CA SBN 275906)
KHASHAN LAW FIRM
38975 Sky Canyon Drive, Suite 201
Murrieta, CA  9253
Tel: (951) 775-7279
Email:lewis@khashanlaw.com

Attorneys for Plaintiffs Mary H. Garcia, et al.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY H. GARCIA, individually and as successor-in-interest to Estate of Phillip Soto Garcia, Jr., (Deceased); ANGELO GARCIA; and PHILLIP J. GARCIA. | Case No. 5:18-cv-839 SJO (ASx) |
| Plaintiffs, | **PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES AND VIOLATIONS OF CIVIL RIGHTS** |
| v. | **JURY TRIAL DEMANDED** |
| SERGEANT AYALA; DEPUTY FIGUEROA, ID # N5758; DEPUTY PEARSON, ID # N5316; DEPUTY L. | |

**1**

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES,
VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

LOPEZ, ID#N6380; DEPUTY )
CORDERO, ID # N6040; DEPUTY )
LLANOS, ID # N5230; DEPUTY )
HINSON, ID # N6248; DEPUTY )
CAVERLEY, ID # N5644; DEPUTY )
RODARTE-LUGO, ID # N6247; )
DEPUTY MIRANDA, ID # N5605; )
DEPUTY VARONI, ID # N6173; )
DEPUTY MALDONADO, ID # )
N5696; DEPUTY KRAMER, ID # )
N5708; DEPUTY TARANGO, ID# __; )
DEPUTY STEELE, ID# __; DEPUTY )
BERGERT, ID # N5819; DEPUTY )
TESILLO, ID # 5490; CITY OF )
CATHEDRAL CITY; Officer )
CLADIU MURZEA, Officer DANIEL )
ANES; Officer JOSEPH BROOKS; )
Officer MATTHEW BUEHLER and )
DOES 1-100, )
              Defendants. )
_____ )

## PRELIMINARY STATEMENT

1. On March 22, 2017, Plaintiffs' decedent, Phillip Soto Garcia, Jr., age 51,

died as a direct and proximate result of acts and/or omissions of employees of the

County of Riverside and Cathedral City.  Deputies, police officers and medical

staff of the Riverside County Sheriff's Department and Cathedral City Police

Department, failed to provide for the safe care and custody of Phillip Soto Garcia,

Jr. ("Decedent") both at the time of his arrest and after housing him at Larry D.

Smith Correction Facility ("LSCF"), when it was apparent to all involved that

Decedent was undergoing an involuntary severe psychiatric episode requiring

immediate mental health treatment.

2. Riverside County Sheriff's Department and Cathedral City Police Department employees were deliberately indifferent to Mr. Garcia's serious medical needs; exercised excessive force upon Mr. Garcia and failed to administer prompt and adequate medical attention resulting in injury upon arrest; injury during detainment; injury from twenty plus hours of solitary confinement; and ultimately death by homicide following confinement in a four point restraint chair.

## JURISDICTION

3. This is a civil rights wrongful death/survival action relating to the death of Decedent Phillip Soto Garcia, Jr., which arises under Title 42 of the United States Code, Sections 1983 and 1988, and the First, Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by Title 28 of the United States Code, Sections 1331 and 1343. Plaintiffs invoked the supplemental jurisdiction of this Court pursuant to Title 28 of the United States Code, Section 1367, to hear and decide claims arising under state law, however the Court refused to accept such jurisdiction necessitating Plaintiffs to file a state court action for the related state law claims. The amount in controversy herein, excluding interest and costs, exceeds the minimum jurisdictional limit of this Court.

**3**

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES,
VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

## VENUE

4. The unlawful acts and practices alleged herein occurred in the County of Riverside, State of California, within this judicial district.  Therefore, venue lies in the United States District Court for the Central District of California.

## CLAIMS REQUIREMENT

5. Plaintiffs have complied with the requirements of California Government Code section 900, et seq., where an action for state court claims is filed against a public entity and its employees.

## SUCCESSOR-IN-INTEREST AFFIDAVIT FILED

6. An appropriate affidavit in compliance with California Code of Civil Procedure §377.32 supporting MARY H. GARCIA's right to bring a survival action on behalf of the Estate of Phillip Soto Garcia, Jr., was concurrently filed with the original complaint and incorporated herein by reference.

7. Mary H. Garcia, in her capacity as Successor-in-Interest to the Estate of Phillip Soto Garcia, Jr. was the wife of Phillip Soto Garcia, Jr. at the time of his death and is therefore successor-in-interest to the Estate of Phillip Soto Garcia, Jr.

## PARTIES

8. At all relevant times, Phillip Soto Garcia Jr., ("Decedent") was an individual residing in the County of Riverside, State of California.

9. Plaintiff, MARY H. GARCIA, individually and as Successor-in-Interest

**4**

to the Estate of Phillip Soto Garcia, Jr., is, and at all times mentioned herein was, a resident of the State of California.  Mary H. Garcia is the wife of Decedent and brings this action both in her own right based on the loss of her husband pursuant to Code of Civil Procedure section 377.60, and in her representative capacity as successor-in-interest to the Decedent's estate.

10. Plaintiff, ANGELO GARCIA, is, and at all times mentioned herein was, a resident of the State of California.  Angelo Garcia is the son of Decedent and brings this action in his own right based on the loss of his father.

11. Plaintiff, PHILLIP JAMES GARCIA, is, and at all times mentioned herein was, a resident of the State of California.  Phillip James Garcia is the son of Decedent and brings this action in his own right based on the loss of his father.

12. Defendant CITY OF CATHEDRAL CITY (hereafter "City") is a public entity located in California and is the employer of officers of the Cathedral City Police Department.

13. Defendant SERGEANT AYALA (hereafter "Ayala") is, and at all times herein mentioned, was a Correctional Sergeant for the Riverside County Sheriff's Department and was charged with supervising Deputies at LSCF, responsible for the protection, care and custody of the inmates at LSCF and for carrying out the policies and procedures of LSCF and the Riverside County Sheriff's Department.

14. Defendant DEPUTY FIGUEROA, ID # N5758 (hereafter "Figueroa")

**5**

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839

is, and at all times herein mentioned, was a deputy working LSCF at the time of the incident and was an employee of the Riverside County Sheriff's Department. Deputy Figueroa was responsible for the protection, care and custody of the inmates at LSCF and was involved in the use of force against Decedent.

15. Defendant DEPUTY PEARSON, ID # N5316 (hereafter "Pearson") is, and at all times herein mentioned, was a deputy working LSCF at the time of the incident and was an employee of the Riverside County Sheriff's Department. Deputy Pearson was responsible for the protection, care and custody of the inmates at LSCF and was involved in the use of force against Decedent.

16. Defendant DEPUTY L. LOPEZ, ID#N6380 (hereafter "Lopez") is, and at all times herein mentioned, was a deputy working LSCF at the time of the incident and was an employee of the Riverside County Sheriff's Department. Deputy Lopez was responsible for the protection, care and custody of the inmates at LSCF and was involved in the use of force against Decedent.

17. Defendant DEPUTY CORDERO, ID # N6040 (hereafter "Cordero") is, and at all times herein mentioned, was a deputy working LSCF at the time of the incident and was an employee of the Riverside County Sheriff's Department. Deputy Cordero was responsible for the protection, care and custody of the inmates at LSCF and was involved in the use of force against Decedent.

18. Defendant DEPUTY LLANOS, ID # N5230 (hereafter "Llanos") is,

**6**

and at all times herein mentioned, was a deputy working LSCF at the time of the incident and was an employee of the Riverside County Sheriff's Department. Deputy Llanos was responsible for the protection, care and custody of the inmates at LSCF and was involved in the use of force against Decedent.

19. Defendant DEPUTY HINSON, ID # N6248 (hereafter "Hinson") is, and at all times herein mentioned, was a deputy working LSCF at the time of the incident and was an employee of the Riverside County Sheriff's Department. Deputy Hinson was responsible for the protection, care and custody of the inmates at LSCF and was involved in the use of force against Decedent.

20. Defendant DEPUTY CAVERLEY, ID # N5644 (hereafter "Caverley") is, and at all times herein mentioned, was a deputy working LSCF at the time of the incident and was an employee of the Riverside County Sheriff's Department. Deputy Caverley was responsible for the protection, care and custody of the inmates at LSCF and was involved in the use of force against Decedent.

21. Defendant DEPUTY RODARTE-LUGO, ID # N6247 (hereafter "Rodarte-Lugo") is, and at all times herein mentioned, was a deputy working LSCF at the time of the incident and was an employee of the Riverside County Sheriff's Department.  Deputy Rodarte-Lugo was responsible for the protection, care and custody of the inmates at LSCF and was involved in the use of force against Decedent.

**7**

22. Defendant DEPUTY MIRANDA, ID # N5605 (hereafter "Miranda") is, and at all times herein mentioned, was a deputy working LSCF at the time of the incident and was an employee of the Riverside County Sheriff's Department. Deputy Miranda was responsible for the protection, care and custody of the inmates at LSCF and was involved in the use of force against Decedent.

23. Defendant DEPUTY VARONI, ID # N6173 (hereafter "Varoni") is, and at all times herein mentioned, was a deputy working LSCF at the time of the incident and was an employee of the Riverside County Sheriff's Department. Deputy Varoni was responsible for the protection, care and custody of the inmates at LSCF and was involved in the use of force against Decedent.

24. Defendant DEPUTY MALDONADO, ID # N5696 (hereafter "Maldonado") is, and at all times herein mentioned, was a deputy working LSCF at the time of the incident and was an employee of the Riverside County Sheriff's Department.  Deputy Maldonado was responsible for the protection, care and custody of the inmates at LSCF and was involved in the use of force against Decedent.

25. Defendant DEPUTY KRAMER, ID # N5708 (hereafter "Kramer") is, and at all times herein mentioned, was a deputy working LSCF at the time of the incident and was an employee of the Riverside County Sheriff's Department. Deputy Kramer was responsible for the protection, care and custody of the

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

inmates at LSCF and was involved in the use of force against Decedent.

26. Defendant DEPUTY TARANGO, ID# __ (hereafter "Tarango") is, and at all times herein mentioned, was a deputy working LSCF at the time of the incident and was an employee of the Riverside County Sheriff's Department. Deputy Tarango was responsible for the protection, care and custody of the inmates at LSCF and was involved in the use of force against Decedent.

27. Defendant DEPUTY STEELE, ID# __ (hereafter "Steele") is, and at all times herein mentioned, was a deputy working LSCF at the time of the incident and was an employee of the Riverside County Sheriff's Department.  Deputy Steele was responsible for the protection, care and custody of the inmates at LSCF and was involved in the use of force against Decedent.

28. Defendant DEPUTY BERGERT, ID # N5819 (hereafter "Bergert") is, and at all times herein mentioned, was a deputy working LSCF at the time of the incident and was an employee of the Riverside County Sheriff's Department. Deputy Bergert was responsible for the protection, care and custody of the inmates at LSCF and was involved in the use of force against Decedent.

29. Defendant DEPUTY TESILLO, ID # 5490 (hereafter "Tesillo") is, and at all times herein mentioned, was a deputy working LSCF at the time of the incident and was an employee of the Riverside County Sheriff's Department. Deputy Tesillo was responsible for the protection, care and custody of the inmates

at LSCF and at the Detention Health Unit of Riverside University Health Services and was involved in the use of force against Decedent.

30. Plaintiff is informed and believes and based thereon alleges that Defendants:  SERGEANT AYALA, DEPUTY FIGUEROA, ID # N5758, DEPUTY PEARSON, ID # N5316, DEPUTY L. LOPEZ, ID#N6380, DEPUTY CORDERO, ID # N6040, DEPUTY LLANOS, ID # N5230, DEPUTY HINSON, ID # N6248, DEPUTY CAVERLEY, ID # N5644, DEPUTY RODARTE-LUGO, ID # N6247, DEPUTY MIRANDA, ID # N5605, DEPUTY VARONI, ID # N6173, DEPUTY MALDONADO, ID # N5696, DEPUTY KRAMER, ID # N5708, DEPUTY TARANGO, ID# __, DEPUTY STEELE, ID# __, DEPUTY BERGERT, ID # N5819, DEPUTY TESILLO, ID # 5490 and DOES 1 through 50 are residents of California.

31. Defendant CLAUDIU MURZEA (hereafter "Murzea") is, and at all times stated herein was, a police officer for Cathedral City (Badge Number 1304), and a resident of California.

32. Defendant DANIEL ANES (hereafter "Anes"), is and at all times stated herein was, a police officer for Cathedral City, and a resident of California.

33. Defendant JOSEPH BROOKS (hereafter "Brooks"), is and at all times stated herein was, a police officer for Cathedral City (Badge Number 1603), and a resident of California.

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

34. Defendant MATTHEW BUEHLER (hereafter "Buehler"), is and at all times stated herein was, a police officer for Cathedral City (Badge Number 1611), and a resident of California.

35. Plaintiffs are ignorant of the true names and capacities of Defendant DOES 1 – 100, inclusive, and therefore sues these defendants by fictitious names. Plaintiffs are informed and believe, and based thereon allege, that each defendant so named is responsible in some manner for the injuries and damages suffered by Plaintiffs. Plaintiffs will amend this complaint to state the true names and capacities of defendants DOES 1 – 100, inclusive, when they have been ascertained.

36. DOES 1-50, inclusive are Deputies, officers, employees or agents of Defendant County of Riverside.  At all times mentioned herein, each named Doe Defendant 1 through 50, inclusive, was the agent or employee of Defendant County and, in doing the things alleged, was acting within the course and scope of such agency or employment and with the actual or implied permission, authorization and approval of the County.

37. DOES 51 – 80, inclusive are agents/employees of Defendant City of Cathedral City. At all times mentioned herein, each named Doe Defendant 51 through 80, inclusive, was the agent or employee of Defendant City and, in doing the things alleged, was acting within the course and scope of such agency or

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

employment and with the actual or implied permission, authorization and approval of the City.

38.  DOES 81 – 100, inclusive are individuals whose identities and employment status are presently unascertained, but who were acting within the course and scope of their employment with the actual or implied permission of their employers whose identities are currently unknown.

## STATEMENT OF FACTS

39. Plaintiffs realleges and incorporates by reference paragraphs 1-38 of this complaint as though fully set forth herein.

40. On March 22, 2017 Cathedral City Police Department Officers, including Defendants Murzea, Anes, Brooks, Buehler and DOES 51 to 80 responded to a 911 call to investigate a "suspicious circumstances" call.

41. The 911 caller, Susan Wentworth and her husband, James Wentworth live in the house next door to where decedent Phillip Soto Garcia Jr. resided.  The Wentworths advised Defendants Murzea, Anes, Brooks, Buehler and DOES 51 to 80 that Mr. Garcia had broken their window, that he had been outside yelling, and that they had no explanation for his bizarre behavior. The Wentworths each advised those officers that Mr. Garcia was not acting like himself and they did not want to press charges against Mr. Garcia for the misdemeanor vandalism. They conveyed their concern for Mr. Garcia's well-being to those officers.

42. Defendants Murzea, Anes, Brooks, Buehler and DOES 51 to 80 then went to Mr. Garcia's home next door to the Wentworth's residence, which is where Mr. Garcia lived with 87 year old Dwight Walker ("Mr. Walker") in order to evaluate Mr. Garcia.

43. Mr. Garcia answered his door when those officers knocked and exited the residence upon demand by the officers. According to Defendants Murzea, Anes, Brooks, Buehler and DOES 51 to 80, when they made first contact with Mr. Garcia, he presented with a menacing look on his face, had blood on his clothing, was shouting vulgarities and speaking incoherently. Video of the incident shows that immediately upon Mr. Garcia exiting his residence at the officers' command, Defendant Murzea threw Mr. Garcia to the ground face first, slamming his face against the concrete so hard that his head left a semi-circle of blood spatter on the concrete. Mr. Garcia was then immediately restrained and handcuffed by the four (4) officers, Murzea, Anes, Brooks and Buehler. Witnesses at the scene speak to the force of the arrest as being overly dramatic and unnecessary. Dispatch records also note that Mr. Garcia was bleeding from his mouth and had an injury to his arm. Mr. Garcia's arrest occurred before any officer entered the residence or had reason to know that anyone inside the residence was injured.

44. While officers searched Mr. Garcia's residence, Mr. Garcia was left prone, face down, with his hands handcuffed behind his back by officers, Murzea,

**13**

Anes, Brooks and Buehler for an extended period lasting approximately 26 minutes. During that 26 minute long period, Defendants Murzea, Anes, Brooks, Buehler and DOES 51 to 80 knew that Mr. Garcia was injured, bleeding from the head and in pain. Mr. Garcia continued to shout vulgarities, and babble "without apparent comprehension" as to his own welfare. Mr. Garcia was questioned while face down on the ground by Defendants Murzea, Anes, Brooks, Buehler and DOES 51 to 80 but failed to respond coherently as to time and situation. Paramedics arrived to treat the arrest injury received by Mr. Garcia, and they were yelled at by Mr. Garcia who was in an incoherent and psychotic state.

45. Mr. Walker, the 87 year old housemate of Mr. Garcia was found injured in his bed.  Officer's returned to Mr. Garcia and questioned him about what they had found inside the house.

46. Defendants Murzea, Anes, Brooks, Buehler and DOES 51 to 80 contacted Mr. Garcia's wife who is also Mr. Walker's caretaker and who holds Mr. Walker's power of attorney. She arrived immediately on scene and provided those officers with significant information about Mr. Garcia's documented history of seizures and neurological condition.  She offered his history of seizures as a plausible explanation for his bizarre behavior. She provided information that Mr. Garcia and Mr. Walker had a father and son type relationship and further indicated that there was no history of conflict between them.

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

47. Mr. Walker was transported via ambulance for emergency medical care and Mr. Garcia was transported via police vehicle to Desert Regional Medical Center for treatment of a "bloody nose" as reported by the arresting officer. Despite the unusual conduct of Mr. Garcia and despite having been advised of his medical history and that he was not behaving like himself, Mr. Garcia was medically evaluated (no mental health evaluation of any kind was implemented) and the officers were given an "okay to book" despite having failed to tend to the mental health need pursuant to both department's policies and procedures.  Mr. Garcia was then forced back into the officer's patrol car.  During the trip, Defendant Brooks witnessed Mr. Garcia engaging in bizarre, self-harming behavior by beating his own head against the protective barrier, which prompted Defendant Brooks to exit the patrol car and instruct Mr. Garcia to stop the behavior.  Prior to arrival at the booking site, Defendant Brooks received orders to return Mr. Garcia for a second medical evaluation in response to Mrs. Garcia's second advisement to Cathedral City police officers that Mr. Garcia had a prior history of seizures. Defendants Murzea, Anes, Brooks, Buehler and DOES 51 to 80, and each of them, failed to inform hospital staff of Mr. Garcia's seizure history at the first O.K. to book medical examination, thus a second examination and CT scan of the head was conducted on Mr. Garcia's return trip to the hospital.

48. At the second visit to Desert Regional Medical Center Mr. Garcia

**15**

underwent a CT Scan of his head. During this evaluation period, Mr. Garcia was physically aggressive, vulgar and continued his onslaught of bizarre shouting. He was physically forced by multiple unknown persons onto a bed and bed restraints were placed on all four limbs. He received a mild medication to attempt to calm him. Despite the medication, his abnormal demeanor continued.

49. The diagnosis for Mr. Garcia's second exam at Desert Regional Medical Center was for a " closed head injury". The head CT showed soft tissue swelling over his left frontal bone. Hospital records note that Mr. Garcia was taken to the ground by responding officers and that he was there for an arrest-related injury.

50. Mr. Garcia was eventually discharged from Desert Regional Medical Center for the second time at 11:34am on March 22, 2017. He was transported to Banning Jail  - LSCF, where he was placed in the custody of the Riverside County Sheriff's Office.

51. Although Defendants Murzea, Anes, Brooks, Buehler and DOES 51 to 80 as well as paramedic staff were told at the arrest site that Mr. Garcia had a history of seizures and was acting in a manner that was completely out of character for him, said officers failed to perform an evaluation pursuant to Welfare and Institutions Code §5150. Had they done so, Mr. Garcia would have received emergency transport, psychiatric intervention, diagnosis and treatment.

1   More importantly, he would still be alive today.

2       52.  Once Mr. Garcia was in the custody of the Riverside County Sheriff's

3   Office on March 22, 2017 at approximately 12:40pm, he was placed into solitary

4   confinement in Sobering Cell #1 at LSCF. It is unclear as to why Mr. Garcia was

5   placed in a Detox cell for isolation when there was no medical indication that

6

7   detoxification was warranted or medically necessary.   Instead, what was evident

8   was that Mr. Garcia suffered from seizures, was exhibiting bizarre behavior and

9   was agitated with incoherent thought processes. Mr. Garcia's behavior while in

10  Sobering Cell #1 included tearing down ceiling tiles and hanging from the ceiling.

11  Mr. Garcia remained in isolation in Sobering Cell #1 until approximately 6:34

12

13  a.m. on March 23, 2017 – which was a total of almost 18 hours from the time that

14  he was first booked into LSCF.  During that time, he was not provided any food or

15  water or medical care/evaluation for the head injury he sustained during his arrest.

16  Nor was Mr. Garcia examined by any mental health professional for his bizarre

17  behavior and known seizure condition, despite the fact that he continued to exhibit

18  bizarre behavior (like banging his head against the cell wall) in the sobering cell

19  throughout his 18 hour isolation.

20      53. On March 23, 2017 at approximately  6:15 a.m., Defendant Pearson

21

22  fired 30 rounds of pepperballs into Sobering Cell #1 while Mr. Garcia was housed

23  in there.  Although Defendant Pearson's report states pepperballs were fired into

**17**

Mr. Garcia's cell on three occasions, Defendant Figueroa's report contradicts that and states that pepperball rounds were fired by Pearson as many as <u>five times</u> into Mr. Garcia's cell.  Sobering Cell #1 is a small, fully enclosed cell measuring only 12 feet wide by 8 feet deep by 8 feet high.  The use of pepperball rounds against Mr. Garcia was approved by Defendant Sergeant Ayala.  Following the pepperball saturation of Mr. Garcia's cell, no decontamination measures were used to get the chemical toxins off Mr. Garcia.

54. Plaintiffs are informed and believe and based thereon allege, that every deputy involved with the use of force on Mr. Garcia at LSCF were aware, prior to the deployment of the pepperballs, that a common symptom from the pepperballs is that it can "create a feeling of helplessness and induce panic" in the pepperball victim.  Plaintiffs are informed and believe and based thereon allege that every deputy present at the scene of the pepperball deployment knew or should have known that a pepperball victim must be decontaminated after pepperballs are used and that a failure to decontaminate a pepperball victim can lead to severe injury, difficulty breathing and victim panic.  Every deputy present at the scene of the pepperball deployment knew or should have known that Mr. Garcia was suffering from a psychotic episode and required mental health treatment before the pepperball deployment occurred.  Every deputy present at the scene of the deployment knew or should have known that firing pepperballs into Mr. Garcia's

cell would escalate the situation and cause Mr. Garcia to experience severe anxiety and fear.  Plaintiff is informed and believes and based thereon alleges that the deployment of pepperball saturation rounds into the small cell in which Mr. Garcia was housed would have caused Mr. Garcia severe respiratory distress and pain.

55. Defendant Pearson also used a salivary gland pressure point maneuver on Mr. Garcia while he was restrained in a 4-point Emergency Restraint Chair ("ERC").  The salivary gland maneuver was done to inflict pain on Mr. Garcia and was not a necessary or reasonable use of force given that Mr. Garcia was already handcuffed at the time he was placed in the ERC and was still under the effects of the pepperballs, stinger grenade, punches and taser that had been used on him during the cell extraction.

56. Moments after 30 rounds of pepperballs were used in Mr. Garcia's cell, Defendant Figueroa then deployed a Stinger grenade into Sobering Cell #1 directly at Mr. Garcia, who was huddled in one corner of the cell in fear.  The use of the grenade was authorized and ordered by Defendant Sergeant Ayala and was part of the use of force tactics that Defendant Ayala and Defendant Steele decided to use against Mr. Garcia, despite him exhibiting signs of severe mental illness. Prior to use of the stinger grenade, Mr. Garcia was standing or kneeling by the cell door and allegedly, failed to comply with Defendant Sergeant Ayala's command

**19**

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES,
VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

to put his hands behind his back to be handcuffed.  After Mr. Garcia moved to the rear of the cell - and without any warning to Mr. Garcia that a stinger grenade would be deployed at him -  Sergeant Ayala gave the command to Deputy Figueroa to deploy the stinger grenade.

57. The #15 Stinger grenade that was used on Mr. Garcia is described in product literature as a "maximum effect device" delivering up to four stimuli for psychological and physiological effect – rubber pellets, light, sound and optional chemical agent.  The grenade sprays rubber balls in a 50 foot radius and delivers 175 decibals of sound at 5 feet.  Product literature for the stinger grenade states that improper use can result in "death or serious bodily injury".  The Centers for Disease Control and Prevention has stated that exposure to sounds at 120 decibals or higher in close proximity to the ear causes pain and ear injury.  The Stinger grenade thrown by Defendant Figueroa detonated within 1 to 2 feet from Mr. Garcia and, according to product literature, had a sound level of 175 decibals. Plaintiffs are informed and believe and based thereon allege, that Mr. Garcia suffered pain and ear injury from the Stinger grenade.  Defendant Figueroa marked that the stinger grenade was "effective" on his use of force report. Despite the grenade being deemed "effective" by Defendant Figueroa, deputies nevertheless inflicted additional, unnecessary and excessive force upon Mr. Garcia, causing Mr. Garcia unnecessary pain, emotional distress and fear.

**20**

58. After deploying the Stinger grenade, Mr. Garcia - in terror - attempted to get away from the smoke and fire-like flash of the grenade by running to the other side of the small cell, whereupon he was then tackled violently to the ground by numerous deputies, all in hazmat suits.  Defendant Figueroa's use of the stinger grenade on Mr. Garcia was unnecessary and unreasonable because Mr. Garcia was still under the effect of the pepperball saturation rounds at the time the grenade was used, it was thrown in very close proximity to Mr. Garcia and no warning was given to Mr. Garcia before its use.

59. Immediately after the stinger grenade went off, Defendant Lopez used a Stun Shield on Mr. Garcia, knocking him to the floor face first at the entrance to Sobering Cell #1.  Defendant Steele assigned Lopez the task of using the stun shield on Mr. Garcia.  The LSCF deputies involved in the use of force against Mr. Garcia then tackled Mr. Garcia to the ground.  In addition to using the stun shield on Mr. Garcia, Defendant Lopez also used the force of his body weight to pin Mr. Garcia to the ground, even though Mr. Garcia was still under the effects of the pepperball saturation rounds and the stinger grenade.  Defendant Lopez's use of force against Mr. Garcia was unnecessary and unreasonable because Mr. Garcia was still under the effect of the pepperball saturation rounds, the stinger grenade and the full body weight of numerous deputies at the time the stun shield was used on him by Defendant Lopez.

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES,
VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

60. Defendant Cordero was involved in using force to tackle Mr. Garcia to the floor and punched Mr. Garcia with his fist on the left side of Mr. Garcia's abdomen at least 3 times. Defendant Cordero was also involved in securing Mr. Garcia to the ERC by using the force of his body weight while Mr. Garcia was already handcuffed and still had painful taser prongs in him. Use of force reports indicate that the tasing was also "effective" to get Mr. Garcia to comply with being handcuffed. Defendant Cordero's use of force against Mr. Garcia was unnecessary and unreasonable because the stinger grenade was already deemed "effective" by Defendant Figueroa, Mr. Garcia had already been placed in handcuffs at the time that Defendant Cordero punched him and was still in handcuffs with taser prongs embedded in his skin at the time Defendant Cordero used force to secure him to the ERC.

61. Defendant Llanos was assigned the task of providing range of motion exercise to Mr. Garcia's limbs every 30 minutes while he was in the ERC, but failed to provide any range of motion exercises throughout the entire 6 hours and 47 minutes Mr. Garcia was in the ERC. Defendant Llanos was also involved in using the force of his body weight to secure Mr. Garcia to the ERC and used control holds on Mr. Garcia despite the fact that he was already restrained to the ERC, was in handcuffs and still had painful taser prongs stuck in the skin of his body. Defendant Llanos's use of force against Mr. Garcia was unnecessary and

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES,
VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

unreasonable because Mr. Garcia was already handcuffed while being restrained to the ERC and still had taser prongs in him at the time Defendant Llanos used control holds on Mr. Garcia.  Additionally, Mr. Garcia was still under the effect of the pepperball saturation rounds because he had never been decontaminated.

62. Defendant Hinson punched Mr. Garcia at least 6 times on the right side of his face and back while Mr. Garcia was tackled to the ground by several other deputies.  Defendant Hinson also applied a carotid restraint hold (where the sides of the neck are squeezed to cut off blood flow to the brain) to Mr. Garcia and was responsible for putting Mr. Garcia into the ERC.  While Mr. Garcia was being strapped to the ERC, Defendant Hinson punched Mr. Garcia at least four times on the right side of his abdomen.  Defendant Hinson's use of force was unreasonable and excessive because Mr. Garcia was already pinned to the ground with a stun shield and the body weight of numerous deputies when Defendant Hinson punched him 6 times and Mr. Garcia was already handcuffed and in the ERC, still under the effects of the pepperball saturation rounds and tasering when Defendant Hinson punched Mr. Garcia multiple times.

63. Defendant Bergert also used the force of his body weight to assist in restraining Mr. Garcia to the ERC. Defendant Bergert's use of force against Mr. Garcia was unnecessary and unreasonable because there was no need for the ERC when the stinger grenade was "effective"; the taser used on Mr. Garcia was

effective; and Mr. Garcia was already handcuffed while being restrained to the ERC, still had taser prongs in him and was still under the effects of the pepperball saturation rounds.

64. Defendant Caverley also assisted in restraining Mr. Garcia to the ERC using the force of his body and was one of the numerous deputies that forcefully tackled Mr. Garcia to the ground immediately after the stinger grenade was deployed at him.  Defendant Caverley's use of force against Mr. Garcia was unnecessary and unreasonable because the stinger grenade had been "effective"; the taser used on Mr. Garcia was effective in getting him to comply with being handcuffed; Mr. Garcia was already pinned to the ground face first by a stun shield; and Mr. Garcia was still under the effect of the pepperball rounds. Additionally, Mr. Garcia was already handcuffed with taser prongs embedded in his skin when Defendant Caverley restrained him to the ERC.

65. Defendant Rodarte-Lugo was one of the numerous deputies that forcefully tackled Mr. Garcia to the ground immediately after the stinger grenade was deployed at him.  Defendant Rodarte-Lugo used his body weight on Mr. Garcia and also pinned Mr. Garcia down by his legs while Deputy Figueroa tased Mr. Garcia.  Defendant Rodarte-Lugo also assisted in forcefully restraining Mr. Garcia to the ERC.  Defendant Rodarte-Lugo's use of force against Mr. Garcia was unnecessary and unreasonable because Mr. Garcia was already pinned to the

**24**

ground face first by a stun shield, and was already under the effects of the pepperball rounds and a stinger grenade.  It was an unnecessary and excessive use of force to pin Mr. Garcia to the ground while he was being tased.  Additionally, Mr. Garcia was already handcuffed with taser prongs embedded in his skin when Defendant Rodarte-Lugo restrained him to the ERC.

66. Defendant Miranda also assisted in restraining Mr. Garcia to the ERC using the force of his body weight. Defendant Miranda's use of force against Mr. Garcia was unnecessary and unreasonable because there was no need to use an ERC when both the stinger grenade and taser were effective and Mr. Garcia had complied with being handcuffed.  It was unnecessary and unreasonable to restrain Mr. Garcia to the ERC while he was already handcuffed, still had taser prongs in him and was still under the effects of the pepperball saturation rounds and stinger grenade.

67. Defendant Varoni applied the salivary gland pressure point maneuver on Mr. Garcia while Mr. Garcia was restrained in the ERC and also assisted in using force to restrain Mr. Garcia to the ERC with the help of numerous other deputies using their body weight against Mr. Garcia.  Defendant Varoni's use of force against Mr. Garcia was unnecessary and unreasonable because the stinger grenade was effective and Mr. Garcia was already handcuffed and therefore did not need to also be restrained to the ERC.  Mr. Garcia still had taser prongs in him

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

and was still under the effects of the pepperball saturation rounds and stinger grenade at the time Defendant Varoni used the pressure point maneuver and force to restrain Mr. Garcia in the ERC.

68. Defendant Tarango also participated in restraining Mr. Garcia in the ERC.  Defendant Tarango's use of force against Mr. Garcia was unnecessary and unreasonable because Mr. Garcia had already complied with being handcuffed after the taser was used on him.  There was no need to restrain him further in the ERC while he was already handcuffed and had taser prongs in him and was still under the effects of the pepperball saturation rounds and stinger grenade. Additionally, while Defendant Tarango used his body weight to hold Mr. Garcia in the ERC other deputies were also applying painful and unnecessary control holds (salivary gland pressure holds) on Mr. Garcia.

69. Plaintiffs are informed and believe and based thereon allege that Defendants Maldonado and Kramer participated in tackling Mr. Garcia to the floor of the sobering cell immediately after the stinger grenade was deployed and were present and witnessed other deputies using excessive force against Mr. Garcia while he was being extracted from Sobering Cell #1 into the ERC, and ultimately, into Safety Cell #3.  Defendants Maldonado and Kramer's use of force against Mr. Garcia was unnecessary and excessive because the stinger grenade was considered "effective" by Defendant Figueroa so there was no need to also

**26**

put their entire body weight on Mr. Garcia to pin him to the floor.

70. While Mr. Garcia was being pinned to the ground at the doorway to Sobering Cell #1 with a stun shield and the weight of approximately 9 deputies on him, Defendant Figueroa deployed his taser onto Mr. Garcia.  The taser probes made contact with Mr. Garcia.  No medical evaluation of Mr. Garcia's injuries from the taser probes was made until at least another hour after deployment, which is in violation of jail policy.  Every deputy present knew that using the taser on Mr. Garcia would cause Mr. Garcia to experience even more fear and anxiety as well as pain to Mr. Garcia and that the taser would injure Mr. Garcia.  Use of the taser was authorized by Sergeant Ayala. Defendant Lopez placed handcuffs on Mr. Garcia after Defendant Figueroa tased Mr. Garcia.

71. After leaving Mr. Garcia alone in Sobering Cell#1 for 18 hours without food, water, medical attention, mental health evaluation, firing 30 rounds of pepperballs into his cell, deploying a Stinger Grenade into his cell, repeatedly punching and tasing Mr. Garcia, Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, and Does 1 to 50 then forcibly restrained Mr. Garcia into the ERC with all four limbs tightly restrained at approximately 6:34 a.m. on March 23, 2017. Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, and Does 1 to 50 put Mr. Garcia into

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

the ERC with Mr. Garcia's arms pinned and handcuffed behind his back rather than resting on the arms of the ERC.  In violation of jail policy which requires that handcuffs be removed at the first possible opportunity, the afore-mentioned deputies left Mr. Garcia's arms handcuffed behind his back while in the ERC for approximately 1 hour and 21 minutes. The use of force by  Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, and Does 1 to 50 was unnecessary and unreasonable because the stinger grenade was already "effective"; the taser was also effective in getting Mr. Garcia to comply with being handcuffed and there was no need for the ERC when Mr. Garcia was already restrained in handcuffs.  Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Maldonado, Kramer, Steele, Ayala and Does 1 to 50 subjected Mr. Garcia to brutal and gratuitous force which was unnecessary for any legitimate penal interest, amounted to punishment and was designed to inflict pain, emotional distress and punishment upon Mr. Garcia, a pre-trial detainee suffering from a mental health crisis.  Each of the foregoing Defendants, and all of them, acted in concert and aided and abetted one another while they violated Mr. Garcia's constitutional rights.

72. On March 23, 2017 at approximately 6:34 a.m., while Mr. Garcia remained completely restrained in the ERC, he was moved into Safety Cell #3 at

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

LSCF where he was left to languish without adequate hydration, food, psychiatric intervention, medical monitoring, supervision and without basic human compassion or care in violation of his constitutional rights for another 3 hours and 10 minutes.  During that time, although jail policy required deputies to untie one limb for range of motion exercises every 30 minutes, all four of Mr. Garcia's limbs remained bound.  Mr. Garcia remained in the ERC for a total of 6 hours and 47 minutes until he was transferred at approximately 1:21pm on March 23, 2017 onto a hospital gurney at Riverside University Health System ("RUHS") in the Detention Health Unit portion of the facility.  Jail policy 503.07 provides that an inmate may not be restrained in an ERC in excess of 4 hours.

73. Defendant Ayala and Defendant Steele were the defendants responsible for devising the plan to use pepperballs, a stinger grenade, taser and ERC on Mr. Garcia, who was suffering from a psychotic episode.  Defendant Steele was responsible for opening the door to allow the Stinger Grenade to be thrown into the cell at Mr. Garcia while Mr. Garcia was still under the effect of the pepperball saturation rounds.  Defendant Ayala supervised and approved all of the various uses of force against Mr. Garcia.

74. Even after being transferred to the hospital gurney and later to a hospital bed, Mr. Garcia's 4 limbs remained <u>completely restrained</u>, without range of motion exercises being performed for another 13 hours 45 minutes until the time

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES,
VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

of his death on March 24, 2017 at 3:06 a.m.  Use of the 4-point restraint systems

of the hospital gurney and hospital bed at the Detention Health Unit of RUHS

were effectively the equivalent of continued use of the ERC on Mr. Garcia.  While

at the hospital, Defendant Tesillo and DOES 1 to 50 were charged with the duty to

monitor and supervise Mr. Garcia.  Tesillo and DOES 1 to 50 made no attempt to

perform range of motion exercises on Mr. Garcia.  Defendant Tesillo and Does 1

to 50's continued use of the ERC on Mr. Garcia at the hospital detention unit

when Mr. Garcia was still suffering from the effects of the pepperball saturation

rounds, stinger grenade, taser use, control holds and beatings from the other

deputies, was an unnecessary, excessive and unreasonable use of force. Defendant

Tesillo's supervisor, Defendant Ayala approved ongoing use of the restraints

without any range of motion exercises.  Worse yet, in addition to Mr. Garcia

having every one of his limbs restrained for hours on end, a spit mask was also

used on him from the time he left LSCF at approximately 9:40 a.m. on March 23,

2017 to approximately 2:24 a.m. on March 24, 2017 – some 16 hours and 44

minutes.  Plaintiffs are informed and believe and based thereon allege, that while

Defendant Tesillo and Does 1 to 50 were with Mr. Garcia at the detention health

unit of the hospital, they kept Mr. Garcia in a spit mask tied to the ERC even

though he posed no spitting threat to staff because he was left alone for extended

periods of time.  The force used by Defendant Tesillo and Does 1 to 50 was

unnecessary, excessive and unreasonable and was without any legitimate penal interest and amounted to punishment of Mr. Garcia.  From the moment Mr. Garcia was first placed in the ERC with all his limbs tightly restrained to the time that he died on a hospital bed with all 4 of his limbs still tightly restrained, the total time Mr. Garcia was in 4-point restraints without range of motion exercises amounted to 20 hours 32 minutes.

75. Plaintiff is informed and believes and based thereon alleges that at all relevant times, Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50 were present and witnessed all of the various use of force methods employed against Mr. Garcia and that none of the afore-mentioned defendants attempted at any time to stop the various use of force methods employed against Mr. Garcia, despite all knowing that Mr. Garcia was experiencing a serious mental health disability.

76.   Medical records show that Mr. Garcia never regained mental awareness while at the hospital and spent all of his time in Riverside County Sheriff's Department custody in a psychotic state.  Plaintiffs are informed and believe and based thereon allege, that Mr. Garcia was drugged and continuously restrained throughout the time he was in the custody of the Riverside County Sheriff's Department.  Plaintiff is informed and believes and based thereon alleges

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

that at all relevant times, every Riverside County sheriff's department employee that came into contact with Mr. Garcia knew or should have known that Mr. Garcia was experiencing a severe psychotic episode that required prompt mental health treatment and medical treatment.

77. When Mr. Garcia was admitted to Riverside University Health Center, his primary admitting diagnoses was rhabdomylosis (which is the rapid destruction of skeletal muscle) and acute kidney injury ("AKI"), neither of which existed at the time that he was given the original "ok to book" order.  Plaintiff is informed and believes and based thereon alleges that the conditions discovered on admission to Riverside University Health Center occurred as a direct result of the acts/omissions of Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and DOES 1 to 100, while Mr. Garcia was in their custody.

78. While at Riverside University Health Center, Mr. Garcia was kept in a portion of the facility reserved for prisoners and Defendant Tesillo, Ayala and DOES 1 TO 50 continued to hold him in 4-point restraints and a spit mask for hours at a time.  Medical staff noted abrasions and lacerations on Mr. Garcia's body at all of his extremities due to the length of time he had been held in restraints.

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

79. On March 23, 2017, a request was made at approximately 10:00 p.m. for Mr. Garcia to be moved to another floor within the medical facility. Mr. Garcia however, did not survive long enough in the hands of his jailers to be moved for further treatment/evaluation because by 3:06 am on March 24, 2017, while still in the custody of the Riverside County Sheriff's Department, he died. The cause of death on Mr. Garcia's death certificate remained as "pending" for approximately one year until an amendment to the death certificate issued in 2018. The Amendment to the Death Certificate, now lists the cause of death as follows:

a. Sudden death in Schizophrenia;

b. Rhabdomyolysis in Association with Physical Exertion by subject and application of control methods;

c. Seizure disorder;

d. Hypertensive Cardiovascular Disease;

e. Homicide

f. Self-initiated physical exertion with control methods applied by law enforcement while in custody.

80. Plaintiffs allege that County of Riverside agents/employees from the Riverside Sheriff's Office, DOES 1 to 100 and Defendant Murzea, used unlawful and excessive force against Mr. Garcia and the County employees failed to summon and administer prompt and adequate medical attention all of which

**33**

caused Mr. Garcia to suffer severe injury and ultimately death.

81. Mr. Garcia was booked into LSCF on March 22, 2017 at 12:35 p.m. The inmate classification intake sheet was marked "yes" as to whether Mr. Garcia suffered from "Current Medical/Mental Health Issues". The intake deputy wrote in on the form that Mr. Garcia "displayed bizarre behavior" and sought an override from his supervisor to assign Mr. Garcia to specialized housing at LSCF. The intake form also indicated that medical/mental health had been notified. Yet, Mr. Garcia was never examined by any mental health professional after being booked into LSCF until March 23, 2017 at 9:00 a.m. – some 20 hours and 25 minutes after being booked. At that time, mental health worker Adelaide Alpin recommended Mr. Garcia for transfer to Riverside University Health Services pursuant to a Penal Code section 4011.6 mental health hold.

82. The delay in having Mr. Garcia's mental health examined immediately upon being booked into LSCF caused a deterioration in his mental health condition and his medical condition.

83. Plaintiffs allege that County of Riverside agents/employees from the Riverside Sheriff's Office and Cathedral City employees, including Defendants Murzea, Anes, Brooks, Buehler and DOES 1 to 100, inclusive, knew, or should have known, that Phillip Soto Garcia, Jr. was suffering from a severe and obvious mental disorder such that it would be inappropriate to classify his as a criminal

detainee, and instead, Phillip Soto Garcia, Jr. should have been classified as a Welfare and Institutions Code 5150 detainee so that appropriate mental health care and treatment would be provided to him.  As a direct and proximate result of County of Riverside agents/employees from the Riverside Sheriff's Office and Cathedral City employees, including Defendants Murzea, Anes, Brooks, Buehler and DOES 1 to 100's conduct in failing to properly assess Phillip Soto Garcia, Jr. and process him under Welfare and Institutions Code Section 5150, Phillip Soto Garcia did not receive proper medical and/or psychiatric care.

84. Additionally, Plaintiffs allege that excessive force was used on Mr. Garcia during the time of his arrest by Defendant Murzea and that Defendants Anes, Brooks, Buehler and DOES 51 to 80 failed to intervene to stop Murzea's use of excessive force or to stop the continued use of excessive force in keeping Mr. Garcia handcuffed and laying on the ground face down for approximately 26 minutes while suffering from the arrest-related head injury. Plaintiffs further allege that excessive force was again used against Mr. Garcia at LSCF and at Riverside University Health Center by Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50 and Does 81-100.

85. Plaintiffs allege that County of Riverside agents/employees from the

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839

Riverside Sheriff's Office and Defendant Murzea violated Phillip Soto Garcia, Jr.'s civil rights by using excessive force against him both during and after his arrest and by being deliberately indifferent to his serious medical and mental health needs by failing to properly evaluate and assess his medical and mental health needs upon detaining him.

86. Plaintiffs allege that County of Riverside agents/employees from the Riverside Sheriff's Office and Cathedral City employees, including Defendants Murzea, Anes, Brooks, Buehler and DOES 1 to 100 failed to communicate to subsequent entities/individuals to whom the care and custody of Phillip Soto Garcia Jr. had been transferred, vital information pertaining to his seizures, medical issues, psychotic behavior and injuries inflicted by employees of both the City and County. Said Defendants failed to warn and provide subsequent entities to whom the care and custody of Phillip Soto Garcia, Jr. had been transferred, information regarding the ongoing bizarre behavior Mr. Garcia had shown while detained.  Mr. Garcia's behavior was consistent with a mental health disorder based on his incoherent thought processes, self-injurious behavior, threats to persons not present and the basis of the arrest of alleged violence against Mr. Walker who was a beloved and respected friend of Mr. Garcia's. The fact that said behavior was out of character for Mr. Garcia and his ongoing seizure history, and clear lack of mental capacity should have been information provided to all persons

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES,
VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839

providing care for Mr. Garcia.

87.    Plaintiffs allege that County of Riverside agents/employees from the Riverside Sheriff's Office and Cathedral City employees, including Defendants Murzea, Anes, Brooks, Buehler and DOES 1 to 100 failed to accommodate Mr. Garcia's obvious disability, thereby violating the Americans with Disabilities Act of 1990.

88. Plaintiffs allege that Defendants Murzea, Anes, Brooks, Buehler and Does 1 to 100, knew or had reason to know that Decedent was in need of immediate medical and psychiatric care and they failed to take reasonable action to summon such medical care.  Said Defendants had a duty to detain this inmate under their supervision in a safe and secure environment while providing humane care, custody and control. From the time of Mr. Garcia's arrest to the time of his death he suffered at the hands of Defendant Murzea's excessive brutality and Defendants Anes, Brooks, Buehler and Does 1 to 100's failure to intervene to stop Murzea's excessive force against Mr. Garcia.  He never had a chance for survival once officers deemed him a violent criminal rather than summoning appropriate help or medically transporting him for a Welfare and Institutions Code Section 5150 evaluation and treatment as he so clearly required during his prolonged state of psychosis.

89. As a direct and proximate result of the acts and/or omissions of

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

Defendants, Decedent Phillip Soto Garcia, Jr. died while in custody.

90.  City, by and through its officers and employees, Defendants Murzea, Anes, Brooks, Buehler and Does 1 to 100, knew, or should have known, that Phillip Soto Garcia, Jr. was suffering from a mental disorder such that it would be inappropriate to classify his as a criminal detainee, and instead, Phillip Soto Garcia, Jr. should have been classified as a Welfare and Institutions Code 5150 detainee such that appropriate mental health care and treatment would be provided to him;

91. City allowed their employees to inadequately communicate information to subsequent entities by insufficiently training them regarding the importance of communicating an arrestee's medical and mental health condition to subsequent entities that are involved in the care and custody of Decedent, as well as failing to train their employees in warning subsequent entities of behavior demonstrated by an arrestee that would indicate the arrestee suffered from a mental health disorder that required treatment.  Said Defendants also failed to train their employees regarding the use of force against individuals who lack the mental capacity due to a mental health condition to understand simple commands and to utilize other de-esacalation techniques instead.

92. City allowed their employees to ignore obvious signs of disability that would require accommodations to be made pursuant to the Americans with

Disabilities Act.

93. City acquiesced in their employees' failure to follow standard operating procedures regarding the use of force, restraints, and providing constitutionally adequate medical care (both mental and physical) such that said employees believed no discipline would be initiated against them for failing to follow such procedures.

94. City acquiesced in their employees' failure to take reasonable action to summon medical care (both mental and physical) when arrestees are in need of immediate medical care such that said employees believed no discipline would be initiated against them for failing to summon medical care when an arrestee required medical care.

95. On July 5, 2011 – approximately 6 years before Mr. Garcia's death, Sheriff Sniff, on behalf of the County of Riverside's Sheriff's Department responded to a 2010-2011 Grand Jury Report which identified deficiencies in the County of Riverside's provision of mental health services to inmates housed in County jails.  In the July 5, 2011 report, Sniff and County acknowledged that "it is the Riverside Sheriff's Department Corrections Division mission to serve and protect by detaining people in a humanely safe and secure manner, and the responsibility for providing the mental health services rests with the Sheriff's Department."  Sniff and

County acknowledged that "the absence of mental health professionals at jail intake could result in delayed mental health treatment." Sniff and County acknowledged that at that time (July 5, 2011) there were "currently delays in mental illness treatment and such delays may impact an inmate's mental stability." Sniff and County further agreed in the report that "continuity in delivery of mental health medications may affect the stability of an inmate's mental health and is critical to inmate care." Sniff and County further agreed that "a delay in transferring an inmate to a state mental hospital and the absence of forced medicating may affect the stability of an inmate's mental health." Sniff and County further agreed with the grand jury's findings in the report by stating "an increase in staffing levels of mental health personnel is needed to attain compliance with Title 15." Sniff and County agreed in the report that "inadequate staffing of both mental and medical health professionals may limit the ability to assess and treat an inmate's mental health."

96. Several years after the grand jury report and Sniff and County's response thereto, the County's failure to summon and render adequate medical care to inmates housed in the County jails, including LSCF was again addressed in a class action lawsuit brought on behalf of County of Riverside jail inmates entitled *Quinton Gray v. County of Riverside*, Case

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

No.:  EDCV 13-0444 VAP, and filed on March 8, 2013 in the United States

District Court for the Central District of California.   In that case, County of

Riverside entered a consent decree which was filed on June 7, 2016 wherein

the County of Riverside agreed to implement remedial measures to address

the failure to provide constitutionally adequate mental health and medical

care to prisoners housed in County of Riverside jails.  The remedial plan

included, among other requirements: that "all health care staff shall provide

community standard of care" in their respective roles; that emergency

procedures are to be provided "immediately"; and that in the event of a

medical emergency, the inmate will be seen by health care staff at an RN

level or higher "as soon as possible".  This rule applies to psychiatric

emergencies in addition to medical emergencies.

97. The remedial plan also provided that all inmates are to be screened

by an RN before being housed and if none are on duty at the time, then

within 14 hours of intake.  The remedial plan also provided that the County

will provide and maintain sufficient staff to execute the healthcare

components of the remedial plan.  The remedial plan provides that inmates

in safety cells shall be offered meals three times a day and water at least

every two hours and that those contacts shall be logged.

98. Plaintiff is informed and believes and based thereon alleges that

**41**

Defendant Sergeant Ayala and other presently unascertained employees of the County of Riverside (Does 1 to 100), knew or should have known about the Consent Decree in the *Gray v. County of Riverside* case and the 2010/2011 grand jury report findings and Sniff and County's response thereto prior to the time Plaintiff was injured.  Plaintiff further alleges on information and belief that Defendant Ayala and Does 1 to 100, knew or should have known based on the 2010/2011 grand jury report and 2016 Consent Decree that the County of Riverside was failing to provide minimally adequate medical and mental healthcare to inmates incarcerated in Riverside County jails in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.  Said employees knew that despite having compliance deadlines for making changes required under the Consent Decree to bring Riverside County jails into compliance, Riverside County jails were not in compliance and were grossly understaffed.

99. Defendant Sergeant Ayala and Does 1 to 100, failed to implement the terms of the remedial plan set forth in the Consent Decree by failing to educate, train, supervise and oversee:  (a) that all of the existing jail staff knew what is required to provide "community standard of care";  and (b) that all jail staff knew how to recognize an emergency and follow universally accepted emergency procedures and protocols when a medical

**42**

emergency occurs.

100. By failing to implement the remedial plan set forth in the Consent Decree, Defendant Ayala and Does 1 to 100,  knew or should have known that the rights of inmates in the County of Riverside jail system to receive constitutionally adequate medical and mental healthcare would be violated and that this deprivation of the inmates' rights would cause severe injury or even death.

101. Had Sergeant Ayala and Does 1 to 100, implemented the terms of the Remedial Plan and adequately supervised and trained the jail staff in accordance with the terms of the Remedial Plan, Decedent would have received proper medical treatment and mental health treatment and prompt and appropriate medical aid would have been rendered.

102. Pursuant to Riverside County Sheriff's Department Corrections Division Policy number 503.07, the following policies existed with respect to the use of restraint chairs at the time of the incident alleged herein: Section 2.1 - Use of the ERC as punishment is strictly forbidden. A violation of this policy will result in disciplinary action and could result in criminal prosecution; Section 2.2 An inmate should not remain in the ERC for more than four hours, unless a sergeant or mental health staff determines the inmate is still violent or self-destructive and medical staff has determined

**43**

that remaining in the ERC is not detrimental to the inmate's health; Section 2.3, only corrections staff who have received formal training on the use of the ERC may use it; Section 5.1 -after an inmate is placed in the ERC, the inmate will be allowed to exercise each of his/her limbs at least once every 30 minutes to prevent blood clots. Each unrestrained limb will be exercised one at a time; Section 6.2 - Medical staff shall evaluate the inmate upon initial placement in the ERC and every two hours thereafter; Section 6.3 - Mental Health staff will evaluate the inmate as soon as possible, but in no case longer than four hours from the time of placement in the ERC; Section 6.4 -Corrections staff shall visually check the inmate twice every 30 minutes for the inmate's safety and well-being; Section 6.5 -Any physical signs of injury or distress shall be reported immediately to on-duty medical staff and/or mental health staff; Section 6.6 - Every two hours, the inmate shall be given the opportunity to use the toilet and drink water from a paper cup, unless a sergeant determines it is unsafe; Section 6.7 - Every two hours a sergeant shall evaluate the need for keeping the inmate in the ERC. The inmate shall be released from the ERC as soon as their behavior is such that they can be safely removed from the ERC.  This review should include consultation with on-duty medical staff and/or mental health staff.

103. Pursuant to Riverside County Sheriff's Department Corrections

**44**

Division Policy number 503.08, once a spit mask (aka "expectorant shield") has been applied, jail staff shall continuously monitor the inmate.

104. Plaintiff is informed and believes and based thereon alleges that Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, inclusive, violated Riverside County Sheriff's Department Corrections Policies number 503.07 and 503.08 while maintaining custody of Mr. Garcia.

105. In doing the acts complained of herein, the Constitutional rights of Decedent and Plaintiffs were violated, including, but not limited to:

a. The right not to be deprived of life or liberty without due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution; and

b. The right to be free from cruel and unusual punishment and from prejudgment punishments as guaranteed by the Eighth Amendment to the United States Constitution and in the case of a pre-trial detainee like Phillip Soto Garcia, Jr., under the Fourteenth Amendment to the U.S. Constitution.

**First Claim**
**Violation of 42 U.S.C. §1983**
**Deliberate Indifference to Serious Medical Needs**
**By Plaintiff Mary Garcia as Successor-In-Interest to the Estate of Phillip**
**Soto Garcia, Jr. Against Defendants Pearson, Cordero, Llanos, Hinson,**
**Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni,**
**Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50**

106. Plaintiff realleges and incorporates by reference paragraphs 1-105 of this complaint as though fully set forth herein.

107. On March 22, 2017, Phillip Soto Garcia, Jr., had a serious medical need in that he either, as a result of a seizure, or some other mental health disorder, was behaving in a manner unusual for him and which resulted in a mental crisis.

108. County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50 knew that Mr. Garcia had a history of seizures and was acting in a manner that was completely out of character for him, yet said Defendants kept Mr. Garcia in solitary confinement for approximately 18 hours without a mental health evaluation; failed to obtain a mental health evaluation of Mr. Garcia in a timely manner; did not do any decontamination of Mr. Garcia after his cell was saturated with pepperballs; did not obtain a medical evaluation of Mr. Garcia's hearing after deploying a stinger grenade directly at him; did  not obtain a medical exam of Mr. Garcia's head and

body after he was slammed to the ground face first during the cell extraction and repeatedly punched by numerous deputies; and delayed in obtaining medical treatment to remove the taser prongs from Mr. Garcia even though he was tied to an ERC and could have received medical treatment earlier.

109. Once in the custody of employees of the Riverside County Sheriff's Department, Mr. Garcia never fully recovered his faculties and was, as a result, drugged, restrained, and the victim of excessive force by County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, despite the fact that it was obvious he was going through a psychotic episode.  Again, although County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50 knew that Mr. Garcia had sustained numerous injuries both before arriving at LSCF and after, including banging his head against the cell, bleeding hands, being tased, punched, pepperballed without decontamination and held in an ERC for an excessively long time without food, water, or range of motion exercises, Mr. Garcia did not receive prompt and adequate mental health treatment or medical care.

110. Phillip Soto Garcia, Jr., as a pre-trial detainee had a Fourteenth Amendment right to medical care, including mental health care.

47

111. County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50 violated Phillip Soto Garcia, Jr.'s, constitutional right to medical care when they acted with deliberate indifference to Phillip Soto Garcia, Jr's serious medical needs by failing to provide/obtain prompt, adequate medical attention for him and mental health treatment for him.

112. At all times, said Defendants were acting under color of law and were acting in the course and scope of their employment with County.

113. At all times, County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50 knew that Phillip Soto Garcia Jr. suffered from seizures and had a serious medical need.

114. At all times, County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50 failed to provide or obtain an appropriate assessment and evaluation of Phillip Soto Garcia Jr.'s injuries; failed to follow basic, universally accepted emergency medical protocols; failed to follow Riverside County Sheriff standard  emergency medical procedures and policies; failed to provide adequate observation and medical intervention for

Phillip Soto Garcia, Jr's serious medical needs; and seriously aggravated Phillip

Soto Garcia's medical condition (both mental and physical).

115. At all times, County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50 delayed in providing appropriate care and treatment of Phillip Soto Garcia, Jr's injuries and mental health condition, and failed to ensure appropriate medical and mental health treatment for Phillip Soto Garcia, Jr.

116. Once at Riverside University Health Center, while still under the care and custody of deputies from the Riverside County Sheriff's office, Phillip Soto Garcia, Jr. was continuously restrained by County employees Tesillo, Ayala and Does 1 to 50 in a manner that was inhumane and damaging to his health and safety and which was excessive and unreasonably long in duration.

117. During the time of his detainment by Riverside County Sheriff's Department employees, Phillip Soto Garcia, Jr. was constrained in a 4-point restraint chair and hospital gurneys and beds in a manner that violated jail policies and procedures, including policy 503.07 and 503.08.

118. Phillip Soto Garcia, Jr. was denied adequate hydration, was inadequately supervised and was treated inhumanely in a manner that amounts to cruel and unusual punishment while constrained to the restraint chair by County

Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50.

119. The conduct alleged herein caused Phillip Soto Garcia, Jr. to be deprived of his civil rights that are protected under the United States Constitution. Mary Garcia, as Successor-In-Interest to the Estate of Phillip Soto Garcia, Jr. makes a claim for Phillip Soto Garcia, Jr.'s pre-death emotional distress, pain and suffering, medical expenses and other damages in an amount to be proven at trial.

120. As a direct and proximate result of County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50's acts and omissions that were deliberately indifferent to Phillip Soto Garcia Jr.'s serious medical needs, Phillip Soto Garcia Jr. died.

121. Plaintiff Mary H. Garcia seeks survival damages for the violation of Phillip Soto Garcia Jr.'s rights.

122. The conduct alleged herein was done in deliberate or reckless disregard of Phillip Soto Garcia Jr.'s constitutionally protected rights, justifying an award of exemplary damages against County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50 in

**50**

an amount according to proof at the time of trial in order to deter Defendants from

engaging in similar conduct and to make an example by way of monetary

punishment.  Plaintiff is also entitled to attorney fees and costs of suit herein.

**Second Claim**
**(Wrongful Death – Cruel and Unusual Punishment)**
**42 U.S.C. § 1983**
**By Plaintiff Mary Garcia, as Successor-In-Interest to the Estate of Phillip**
**Soto Garcia, Jr. Against County Defendants Pearson, Cordero, Llanos,**
**Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez,**
**Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50**

123. Plaintiff realleges and incorporates by reference paragraphs 1-122 of

this complaint as though fully set forth herein.

124. County Defendants Pearson, Cordero, Llanos, Hinson, Bergert,

Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer,

Maldonado, Steele, Tesillo, Ayala and Does 1 to 50 committed wrongful acts

under color of law which proximately caused the death of Phillip Soto Garcia Jr.

In doing the acts/omissions complained of, County Defendants Pearson, Cordero,

Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez,

Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50,

saw Phillip Soto Garcia, Jr. in medical distress but failed to summon for medical

aid or obtain a mental health assessment for him which ultimately resulted in the

loss of his life.  Said Defendants also undertook to confine Mr. Garcia in a manner

that was dangerous to his health, safety and welfare by ignoring obvious signs of a

serious mental health disorder and physical injuries requiring immediate medical attention.

125. County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50 deprived Phillip Soto Garcia, Jr., of his rights under the U.S. Constitution to be free from cruel and unusual punishment and punishment without due process under the Fourteenth Amendment to the U.S. Constitution.

126. The foregoing wrongful acts were done with deliberate indifference to the safety and welfare of Phillip Soto Garcia, Jr.

127. County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, acted under the color of state law to deprive Phillip Soto Garcia, Jr., of certain constitutionally protected rights including, but not limited to, the right not to be deprived of life or liberty without due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution, the right to be free from violence and the right to be free from cruel and unusual punishment under the due process clause of the Fourteenth Amendment to the U.S. Constitution.

128. Plaintiff Mary H. Garcia in her capacity as Successor-in-Interest to the

Estate of Phillip Soto Garcia Jr., alleges that the conduct alleged herein caused Phillip Soto Garcia, Jr., to be deprived of his civil rights that are protected under the United States Constitution, as well as cause Phillip Soto Garcia Jr., pre-death pain, suffering, emotional distress and medical expenses.

129. The conduct alleged herein was done in deliberate or reckless disregard of Phillip Soto Garcia Jr.'s constitutionally protected rights, justifying an award of exemplary damages against County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, in an amount according to proof at the time of trial in order to deter Defendants from engaging in similar conduct and to make an example by way of monetary punishment.  Plaintiff is also entitled to attorney fees and costs of suit herein.

**Third Claim**
**Right of Association**
**By Plaintiffs against County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50.**

130. Plaintiffs reallege and incorporate by reference paragraphs 1-129 of this complaint as though fully set forth herein.

131. County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, deprived Phillip Soto Garcia

**53**

Jr., of his rights under the United States Constitution to be free from cruel and unusual punishment, denial of medical care and denial of due process. County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50 used excessive force against Mr. Garcia, including, pepperballs, a stinger grenade, stun shield, taser, punching, various control hold methods and restraining him in an ERC unnecessarily, all of which proximately caused his death.

132. The aforementioned acts and/or omissions of County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, were deliberately indifferent to Phillip Soto Garcia Jr's. serious medical needs, health and safety; and violated Decedent's civil rights to be free from cruel and unusual punishment and excessive force. Said acts/omissions deprived Plaintiffs Angelo Garcia and Phillip J. Garcia of their liberty interest in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the U.S. Constitution, and deprived Plaintiff Mary H. Garcia of her liberty interest in the spousal/marital relationship she had with Decedent.

133. There was no legitimate penological interest in denying and delaying

54

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

access to medical care to an inmate in obvious medical distress. There was no legitimate penological interest in using excessive force against Mr. Garcia, particularly when Defendant Figueroa found the stinger grenade "effective" and the taser was "effective" to get Mr. Garcia to be handcuffed.  County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50's actions shock the conscience.

134. The deprivation of the rights alleged above has destroyed the Constitutional rights of Phillip Soto Garcia Jr.'s 's children, Angelo Garcia and Phillip J. Garcia to the society and companionship of their father which is protected by the substantive due process clause of the Fourteenth Amendment.

135. The deprivation of the rights alleged above has destroyed the Constitutional rights of Phillip Soto Garcia Jr.'s wife, Mary H. Garcia, to the spousal/marital relationship and society and companionship of her husband which is protected by the substantive due process clause of the Fourteenth Amendment.

136. The conduct alleged herein violated Phillip Soto Garcia Jr.'s rights alleged above thereby resulting in a deprivation of Plaintiffs' rights alleged above, which has legally, proximately, foreseeably and actually caused Plaintiffs to suffer the loss of Decedent's care, comfort and society, and further damages according to proof at the time of trial.

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

137. Plaintiff Mary H. Garcia brings this claim both individually and as successor-in-interest to the Estate of Phillip Soto Garcia Jr. and seeks both survival and wrongful death damages for the violation of Phillip Soto Garcia Jr.'s rights and her own rights.

138. The conduct alleged herein was done in deliberate or reckless disregard of Phillip Soto Garcia Jr.'s constitutionally protected rights, justifying an award of exemplary damages against County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, in an amount according to proof at the time of trial in order to deter Defendants from engaging in similar conduct and to make an example by way of monetary punishment.  Plaintiffs are also entitled to attorney fees and costs of suit herein.

**Fourth Claim**
**Excessive Force**
**By Plaintiff Mary Garcia as Successor-In-Interest to the Estate of Phillip Soto Garcia, Jr. Against Defendant Murzea and County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50.**

139. Plaintiff realleges and incorporates by reference paragraphs 1 – 138 of this complaint.

140. At all times stated herein, Defendant Murzea and County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda,

Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and

Does 1 to 50  acted under color of law to deprive Phillip Soto Garcia, Jr. of certain

constitutionally protected rights, including, but not limited to:

> (a)  The right to be free from excessive force being used against him under the Fourth, Fourteenth and Fifth Amendments to the U.S. Constitution;
> (b)  The right to be free from unreasonable searches and seizures as guaranteed by the Fourth and Fourteenth Amendments to the US Constitution;
> (c)  The right not to be deprived of life or liberty without due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution;
> (d)  The right to equal protection of the laws, as guaranteed by the Fourteenth Amendment to the U.S. Constitution; and
> (e)  The right to be free from the imposition of cruel and unusual punishment.

141. Defendant Murzea and County Defendants Pearson, Cordero,

Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa,

Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and

Does 1 to 50, deprived Phillip Soto Garcia, Jr. of the foregoing constitutional

rights when they used unreasonable force to arrest/restrain Phillip Soto

Garcia, Jr.

142. The force used by Defendant Murzea when he threw Mr. Garcia

to the ground immediately after Mr. Garcia obeyed Defendant Murzea's

command to exit his home was excessive and unreasonable because Mr.

Garcia was not armed, did not pose a threat and was complying with

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES,
VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839

Defendant Murzea's verbal command to come out of the residence.  Despite

Mr. Garcia's compliance, Defendant Murzea threw Mr. Garcia to the

concrete face first, causing Mr. Garcia a head injury and aggravating his

mental health crisis.

143. The force used by County Defendants Pearson, Cordero, Llanos,

Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez,

Varoni, Tarango, Kramer, Maldonado, Steele, Ayala, Tesillo and Does 1 to

50 was unnecessary, excessive and unreasonable for the following reasons:

(a)  Immediately prior to the use of pepperball saturation rounds,

stinger grenade, stun shield, taser use, body weight of multiple deputies and

physical beating of Decedent, Decedent did not have a weapon and was

locked in solitary confinement, and thus, did not represent any threat to third

parties including any of the deputies;

(b)  County Defendants Pearson, Cordero, Llanos, Hinson, Bergert,

Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango,

Kramer, Maldonado, Steele, Ayala and Does 1 to 50 did not wait a sufficient

amount of time to determine whether the pepperball saturation rounds were

effective in getting Decedent to comply with being handcuffed for transfer to

another cell before they started using additional levels of force on Decedent;

(c)  While Decedent was still under the effect of the pepperball

saturation rounds, the stinger grenade was thrown directly at him in close

proximity to his body.  While Decedent was engulfed in smoke, light and

noise from the stinger grenade, Defendants Pearson, Cordero, Llanos,

Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez,

Varoni, Tarango, Kramer, Maldonado, Steele, Ayala and Does 1 to 50, used

and/or ordered additional force to be used on Decedent even though

Defendant Figueroa said the stinger grenade was "effective";

(d)  Even though the taser that was used on Decedent was effective to

get him to comply with being handcuffed, Defendants Pearson, Cordero,

Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa,

Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Ayala, Tesillo, and

Does 1 to 50, used and/or ordered additional force to be used on Decedent,

including being held in an ERC while simultaneously being handcuffed with

taser prongs still embedded in Decedent's skin.

(e)  County Defendants Pearson, Cordero, Llanos, Hinson, Bergert,

Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango,

Kramer, Maldonado, Steele, Ayala and Does 1 to 50 attended a briefing

before the cell extraction was attempted during which all of the various

methods of force used were planned out.  Thus, all of the force used by said

Defendants was a "controlled" use of force, meaning that said Defendants

had time to reflect on the force to be used before using it. Defendant Tesillo's continued use of the spit mask while Decedent was restrained in the ERC was also "controlled" because there was ample time to reflect on whether it was still necessary when Decedent was left by himself for extended periods of time.

(f)  County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Ayala, Tesillo and Does 1 to 50's use of force both in design and implementation demonstrated deliberate indifference to Mr. Garcia's mental illness and the harms that could be caused by this type of force against Mr. Garcia; and

(g)  County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Ayala, Tesillo and Does 1 to 50 acted maliciously, sadistically, or for the purpose of causing harm to Mr. Garcia. The force used by said Defendants was brutal, gratuitous and was unnecessary for any legitimate penal interest and amounted to punishment against a pre-trial detainee suffering from a mental health crisis.

144. County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango,

Kramer, Maldonado, Steele, Ayala, Tesillo and Does 1 to 50 acted in concert and aided and abetted one another while they violated Decedent's constitutional rights.

145. Autopsy reports indicate that Mr. Garcia suffered massive injuries over his entire body from County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Ayala, Tesillo and Does 1 to 50's use of force including, but not limited to:  abrasions to the face, head, both wrists, fingers, hands, ankles, left knee, pelvis and hip; blunt impact injuries were noted at the head, neck, torso and extremities; some of the contusions measured between 4 to 5 inches in size; and areas of hemorrhage were noted at the cervical spine, laryngeal cartilages, and hyoid bone and strap muscles of the neck.

146. Defendant Murzea and County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50's conduct caused Phillip Soto Garcia, Jr. to suffer extreme pain and suffering and emotional distress, and ultimately, once he was moved to Riverside University Health System, death.

147. Defendant Murzea and County Defendants Pearson, Cordero,

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, were integral participants in the use of excessive force.

148. Defendants Anes, Brooks, Buehler and City employees DOES 51 to 80 also failed to intervene to prevent the violation when each of said Defendants failed to stop Defendant Murzea from using excessive force against Phillip Soto Garcia, Jr.

149. County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, also failed to intervene to prevent the violation when each of said Defendants failed to stop each other from using excessive force against Phillip Soto Garcia, Jr.

150. Defendants Murzea, Anes, Brooks, Buehler and City employees DOES 51 to 80 and County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, knew that failure to provide timely medical treatment for Phillip Soto Garcia, Jr. could result in further significant injury or the unnecessary and wanton infliction of pain, but disregarded that serious medical need, causing Phillip Soto Garcia, Jr. great bodily harm and ultimately, death.

151. The foregoing use of force described above was excessive and unreasonable under the circumstances because prior to and after being restrained by the officers, Phillip Soto Garcia, Jr. did not resist or pose a threat to the safety of the defendant police officers and deputies.

152. During the relevant period, Defendant Murzea was performing his duties as an officer of the Cathedral City Police Department.

153. During the relevant period County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50 were performing their duties as deputies of the Riverside County Sheriff's Department.

154. Based on the conduct of Defendant Murzea and County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, Phillip Soto Garcia, Jr. was deprived of his constitutional rights under the Fourth, Fourteenth and Fifth Amendments to the U.S. Constitution.

155. Defendant Murzea and County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and

**63**

Does 1 to 50 knew that the force they used was illegal.  Phillip Soto Garcia,

Jr. was subjected to humiliation, fear, physical injury, and pain and suffering

by the illegal acts of Defendant Murzea  and County Defendants Pearson,

Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda,

Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo,

Ayala and Does 1 to 50 and ultimately, death.

156. The conduct of Defendant Murzea and County Defendants

Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo,

Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele,

Tesillo, Ayala and Does 1 to 50 was willful, wanton, malicious, oppressive,

and done with reckless disregard for the rights and safety of Phillip Soto

Garcia, Jr. and therefore warrants the imposition of exemplary and punitive

damages against said Defendants.

**Fifth Claim**
**Failure to Intervene (42 U.S.C. §1983)**
**By Plaintiff Mary Garcia as Successor-In-Interest to the Estate of Phillip
Soto Garcia, Jr. Against Defendants Anes, Brooks, Buehler and City
employees DOES 51 to 80 and County Defendants Pearson, Cordero, Llanos,
Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez,
Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50**

157. Plaintiff realleges and incorporates by reference paragraphs 1 -156 of

this complaint.

158. At all times relevant here, Defendants Anes, Brooks, Buehler and City

**64**
**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES,
VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

employees DOES 51 to 80 and County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, were present and were charged with the constitutional duties of protection of Phillip Soto Garcia, Jr., and were charged with the duty to not knowingly, with wanton disregard, cause his life, health and safety to be placed in danger by intentionally and/or deliberately ignoring the known dangers to Phillip Soto Garcia, Jr., that their actions and/or omissions placed him in.

159. At all times relevant here, Defendant Anes, Brooks, Buehler and City employees DOES 51 to 80 and County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50,  had an affirmative duty to  intervene to stop fellow officers from violating the constitutional rights of arrestees/detainees, including Phillip Soto Garcia, Jr., each of the afore-mentioned Defendants had ample and reasonably sufficient time and opportunity to so intervene and prevent Phillip Soto Garcia, Jr.'s injuries, and were compelled to do so as officers of either the Cathedral City Police Department or the Riverside County Sheriff's Department under the laws of the State of California and under the Constitution of the United States of America.

160. In deliberate indifference to the life and welfare of Phillip Soto

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES,
VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

Garcia, Jr., each said defendant intentionally and with deliberate indifference to the civil rights of Phillip Soto Garcia, Jr., refrained from intervening in the acts leading to Phillip Soto Garcia, Jr.'s injuries.

161. As a direct and proximate result thereof, Phillip Soto Garcia, Jr.'s rights under the Fourth and Fourteenth Amendments to the U.S. Constitution were violated.  As a further result thereof, Decedent sustained injuries and damages alleged herein.

162. The conduct of Defendants Anes, Brooks, Buehler and City employees DOES 51 to 80 and County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, was intentional, malicious, willful, wanton and in reckless disregard of Phillip Soto Garcia, Jr.'s constitutional rights in that this conduct shocks the conscience and is fundamentally offensive to a civilized society, so as to justify the imposition of punitive damages against said Defendants.

**Sixth Claim**
**Violation of 42 U.S.C. §1983**
**Failure to Protect & Cruel and Unusual Punishment**
**Fourteenth Amendment**
**By Plaintiff Mary Garcia as Successor-In-Interest to the Estate of Phillip Soto Garcia, Jr., against County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez,**

66

**Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50**

163. Plaintiff realleges and incorporates by reference paragraphs 1-162 of this complaint as though fully set forth herein.

164. Phillip Soto Garcia, Jr., was incarcerated at LSCF under conditions that posed a substantial risk of serious harm to his health and safety, which were known to County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50.  Such conditions included:

(a)  constraining Phillip Soto Garcia, Jr. to a 4-point restraint chair or bed for a combined 20 hours and 32 minutes without adequate supervision, hydration and medical attention, all while he was in clear physical and mental distress;

(b)  Placing Phillip Soto Garcia, Jr., who suffered seizures and a mental health condition in a sobering cell without adequate monitoring and supervision;

(c)  Failing to perform adequate monitoring and supervision of Phillip Soto Garcia, Jr., including performing range of motion exercises;

(d)  Failing to follow standard operating procedures regarding the performance of physical visual inspections of inmates in sobering cells and those being held in restraints;

**67**

(e)  Using excessive force against Phillip Soto Garcia, Jr., including, pepperballs, a stinger grenade, stun shield, taser, punches, multiple control holds and an ERC with a spit mask;

(f) using excessive force against Mr. Garcia while he was experiencing a mental health crisis, thereby punishing him for his mental health condition; and

(g)  Failing to timely intervene to stop the use of excessive force against Phillip Soto Garcia, Jr.

165. County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, had ample and reasonably sufficient time and opportunity to intervene and prevent the use of excessive force against Phillip Soto Garcia Jr. and to prevent his injuries and ultimate death, and were compelled to do so as Sheriff's deputies and/or medical staff, under the laws of the State of California and under the Constitution of the United States of America.

166. In deliberate indifference to the life and welfare of Phillip Soto Garcia, Jr., each said Defendant intentionally and with deliberate indifference to the civil rights of Phillip Soto Garcia, Jr., refrained from intervening in the acts leading to Phillip Soto Garcia Jr.'s injuries and ultimate death.

167. County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, acted under the color of state law to deprive Phillip Soto Garica, Jr., of certain constitutionally protected rights including, but not limited to, the right not to be deprived of life or liberty without due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution and the right to be free from cruel and unusual punishment and unreasonable searches and seizures.

168. The above acts and omissions, while carried out under color of law, have no justification or excuse in law, and instead constitute a gross abuse of governmental authority and power, shock the conscience, are fundamentally unfair, arbitrary and oppressive and unrelated to any activity which governmental officers may appropriately and legally undertake in the course of protecting persons or property or ensuring civil order.

169. In acting or failing to act as hereinabove alleged, County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, were deliberately indifferent to the substantial risk posed to Phillip Soto Garcia, Jr.'s health and safety.

170. As a proximate result of the aforementioned wrongful conduct, Phillip

Soto Garcia, Jr. Garcia suffered injuries and ultimately, death.

171. The conduct of County Defendants Pearson, Cordero, Llanos, Hinson, Bergert, Caverley, Rodarte-Lugo, Miranda, Figueroa, Lopez, Varoni, Tarango, Kramer, Maldonado, Steele, Tesillo, Ayala and Does 1 to 50, was intentional, malicious, willful, wanton and in reckless disregard of Phillip Soto Garcia, Jr.'s constitutional rights and/or grossly negligent in that this conduct shocks the conscience and is fundamentally offensive to a civilized society, so as to justify the imposition of punitive damages against each of the foregoing individual defendants.

**Seventh Claim**
**Violation of Americans With Disabilities Act**
**By Plaintiffs against Defendant City**

172. Plaintiff realleges and incorporates by reference paragraphs 1 – 171 of this complaint.

173. Under Title II of the Americans With Disabilities Act, 42 USC § 1231, et seq., and Section 504 of the Rehabilitation Act, 29 USC § 701, et seq., Phillip Soto Garcia Jr. is a qualified individual with a disability as defined by 42 USC § 12102(1) and 29 USC § 705 because he suffers from seizures which impair his mental health and which substantially limited Phillip Soto Garcia Jr.'s major

life activities, including his ability to communicate with people, understand people, his ability to learn, and to care for himself in activities of daily living.

174. Defendant City, through its employees Defendants Murzea, Anes, Brooks, Buehler, and City employees DOES 51 to 80, knew or should have known that Phillip Soto Garcia Jr. had such a mental health impairment/disability before he was arrested and Phillip Soto Garcia Jr. was regarded by others as possessing that disability.

175. At all times, Defendants Murzea, Anes, Brooks, Buehler, and City employees DOES 51 to 80 knew of Phillip Soto Garcia Jr.'s disability or should have known of his disability because it was obvious from his erratic behavior at the time of his arrest and in subsequent interactions with him while he was being taken to Desert Regional Medical Center.  Decedent's disability was also communicated by Mary Garcia, Phillip Soto Garcia Jr.'s wife to Defendants Murzea, Anes, Brooks, Buehler, and City employees DOES 51 to 80 following his arrest.

176. At the time that City employees Defendants Murzea, Anes, Brooks, Buehler, and DOES 51 to 80 approached Phillip Soto Garcia Jr., a reasonable accommodation for Phillip Soto Garcia Jr.'s mental health disability could have, and should have, been made in order to avoid an escalation of the situation because Phillip Soto Garcia Jr's mental health disability was obvious.

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839**

177. Defendant City (by and through its employees) failed to reasonably accommodate Phillip Soto Garcia Jr.'s disability in the course of arresting him and subsequently detaining him, thereby causing him to suffer greater injury and indignity than other individuals.

178. Potential accommodations might have included, but are not limited to:  communicating with Phillip Soto Garcia Jr. in a non-threatening manner, speaking to Phillip Soto Garcia Jr. in a way that was non-threatening and calming in order to avoid an escalation of the situation and to avoid the use of force; contacting another officer or employee who specializes in communicating with disabled individuals like Phillip Soto Garcia Jr. to facilitate the necessary interaction, or removal; by respecting Phillip Soto Garcia Jr.'s comfort zone, engaging in non-threatening communications and gestures with Phillip Soto Garcia Jr. directly, and using the passage of time to defuse the situation.  Procedures and techniques for accommodating individuals with disabilities were also part of the City employees' Peace Officer Standards Training ("POST") and therefore, were known or should have been known to employees of Defendant City at the time of the interactions with Phillip Soto Garcia Jr..

179. By declining to provide the foregoing accommodations to Phillip Soto Garcia Jr., City employees denied Phillip Soto Garcia Jr. the benefits and services of government programs, services, or activities, as well as subjected him

**72**

to discrimination on account of his disability.  As a public entity that receives federal financial assistance, Defendant City is vicariously liable for its employees' violations of Title II of the Americans With Disabilities Act and Section 504 of the Rehabilitation Act.

180. Defendant City failed to make reasonable modifications necessary to avoid discrimination against individuals with mental health disabilities, like Phillip Soto Garcia Jr. both in the context of arrest and his detention and transport to Larry Smith Correctional Facility.  Defendants Murzea, Anes, Brooks, Buehler, and City employees DOES 51 to 80 knew or should have known that by failing to accommodate and ignore Mr. Garcia's obvious signs of a mental health disorder during the arrest and subsequent booking process, mental health treatment would not be provided to Mr. Garcia or mental health treatment would be seriously delayed – both of which would result in a violation of Mr. Garcia's right to medical care under the due process clause of the Fourteenth Amendment. Additionally, to the extent that Mr. Garcia's mental health condition caused him to yell profanity at officers, Defendants Murzea, Anes, Brooks, Buehler, and City employees DOES 51 to 80 knew or should have known that by failing to accommodate his condition, Mr. Garcia's actions would be construed by corrections personnel as defiant and would likely subject Mr. Garcia to an

unnecessary and excessive use of force in violation of his rights under the Fourth and Fourteenth amendments.

181. As a result of the foregoing conduct, Phillip Soto Garcia Jr.'s rights under Title II of the Americans With Disabilities Act and Section 504 of the Rehabilitation Act were violated and he was discriminated against because of his disability.

182. As a direct and proximate result of the actions of Defendant City, Phillip Soto Garcia Jr. suffered severe harm including significant physical and psychological injuries and ultimately, death.

## **PRAYER**

1.      WHEREFORE, Plaintiffs pray for the following relief:

a. For compensatory and general damages in whatever amount may be proven at trial, including both survival damages and wrongful death damages;

b. For funeral and burial expenses and loss of financial support;

c. For punitive damages against the individual defendants, as alleged in the pertinent claims herein, in an amount to be proven at trial;

d. Reasonable costs of suit and attorneys' fees pursuant to 42 U.S.C. §1988 and Cal. Civ. Code section 52.1 where appropriate;

e. Prejudgment interest; and

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES, VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839

f.  Such other relief as the Court may deem proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs respectfully demand that the present matter be set for a jury trial.

Dated:  October 29, 2018          \s_____
                                  Robert Trujillo, Esq.
                                  Attorney for Plaintiffs, Mary Garcia, Angelo
                                  Garcia and Phillip J. Garcia

Dated:  October 29, 2018          \s_____
                                  Melody Trujillo, Esq.
                                  Attorney for Plaintiffs, Mary Garcia, et al.

Dated:  October 29, 2018          \s_____
                                  Suzanne Skolnick, Esq.
                                  Attorney for Plaintiffs, Mary Garcia, et al.

Dated:  October 29, 2018          \s_____
                                  Lewis Khashan, Esq.
                                  Attorney for Plaintiffs, Mary Garcia, et al.

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES,
VIOLATIONS OF CIVIL RIGHTS   CASE NO.: 5:18-CV-839