TRUJILLO & TRUJILLO, APLC
Robert Trujillo, Esq. (CA SBN 148975)
Melody Trujillo, Esq. (CA SBN 165218)
41593 Winchester Road, Suite 201
Temecula, CA 92590
Tel: 951-296-9529
Email: trulaw@trujillo-law.us

Suzanne Skolnick, Esq. (CA SBN 211076)
2888 Loker Avenue East, Suite 110-F
Carlsbad, CA 92010
Tel: 760-405-4397
Email: suzanne@skolnicklawgroup.com

Lewis Khashan, Esq. (CA SBN 275906)
KHASHAN LAW FIRM
38975 Sky Canyon Drive, Suite 201
Murrieta, CA 9253
Tel: (951) 775-7279
Email:lewis@khashanlaw.com

Attorneys for Plaintiffs,
Mary Gacia, et al.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY H. GARCIA, individually and as successor-in-interest to Estate of Phillip Soto Garcia, Jr. (Deceased); ANGELO GARCIA; PHILLIP J. GARCIA, <br><br> Plaintiffs, <br><br> vs. <br><br> SERGEANT AYALA, et al, <br><br> Defendants. | CASE NO. 5:18 CV 00839 SJO (ASx) <br><br> PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF LAW AND FACT <br><br><br> PTC: June 10, 2019, 9:00 a.m. <br> Trial: June 18, 2019, 8:30 a.m. <br> Ctrm: 10C |

TO THE HONORABLE COURT, ALL PARTIES HEREIN AND THEIR RESPECTIVE

ATTORNEYS OF RECORD:

Plaintiffs, by and through their counsel of record, hereby respectfully submit their

Memorandum of Contentions of Fact and Law pursuant to Local Rule 16-4.


Respectfully submitted,

Date:  May 20, 2019                ____/s/ Lewis Khashan, Esq.

Attorney for Plaintiffs, Mary Garcia, et al.

i

# <u>TABLE OF CONTENTS</u>

I.    CONTENTIONS OF FACT AND SUMMARY OF EVIDENCE ............................ 1

   A.  Defendants' Used Excessive Force/Failed to Intervene to Stop the Use of
Excessive Force Against Decedent, Thereby Causing His Death.............................. 1

   B.  Defendants Were Deliberately Indifferent to Decedent's Medical Needs ........... 8

   C.  Causation........................................................................................................ 9

II.   CONTENTIONS OF LAW ........................................................................... 11

   A.  Federal Civil Rights Claims – Individual Defendants (42 U.S.C. § 1983, 4th and
14th Amendments)................................................................................................ 11

      1.  First Claim for Relief – Deliberate Indifference to Medical Needs .......... 11

      2.  Second Claim for Relief – Wrongful Death/Cruel and
Unusual Punishment.................................................................................. 12

      3.  Third Claim for Relief – Interference with Familial Right of
Association ............................................................................................... 13

      4.  Fourth Claim for Relief – Excessive Force................................................ 15

      5.  Fifth Claim for Relief – Failure to Intervene to Stop Excessive Force ..... 16

      6.  Sixth Claim for Relief – Failure to Protect ................................................ 18

   B.  Causation....................................................................................................... 18

   C.  Damages........................................................................................................ 20

      1.  Compensatory Damages............................................................................ 20

         a.  Mr. Garcia's Loss of life, Pre-death Pain and Suffering.................. 20

         b.  Plaintiffs Angelo and Phillip James' Loss of Their Familial
Relationship with Their Father and Plaintiff Mary Garcia's Loss of
Relationship with her Spouse.............................................................. 20

      2.  Punitive Damages..................................................................................... 21

D. Attorneys' Fees ...................................................................................... 21

E. Key Evidence Relied on By Plaintiffs in Support of Their Claims ..................... 21

III. CONTENTIONS OF LAW – AFFIRMATIVE DEFENSES .................................. 21

A. Defendants' Affirmative Defenses ............................................................. 21

B. Qualified Immunity Does Not Apply ....................................................... 22

C. Defendants Are Not Entitled to an Offset Because They Cannot Prove the
Settlement with Cathedral City Defendants was For the Same Injury. .......... 22

IV. ANTICIPATED EVIDENTIARY ISSUES ........................................................ 23

A. Motions In Limine .................................................................................. 23

V. BIFURCATION OF ISSUES ......................................................................... 24

VI. JURY TRIAL DEMANDED .......................................................................... 24

VII. ABANDONMENT OF ISSUES ..................................................................... 24

1

2

## **TABLE OF AUTHORITIES**

3

4 **Cases**

5

6
Arnold v. Int'l Bus. Mach. Corp., 637 F.2d 1350 (9th Cir. 1981)........................................ 19

7
Banks Ex Rel. Banks v. Yokemick, 177 F.Supp.2d 239 (S.D.N.Y. 2001) ....................... 22

8
Blankenhorn v. County of Orange, 485 F. 3d 463, (9th Cir. 2007).................................... 18

9

10
Boyd v. Benton County, 374 F.3d 773 (9th Cir. 2004) ........................................ 17

11
Cabral v. Cty. of Glenn, 624 F. Supp. 2d 1184 (E.D. Cal. 2009)........................................ 22

12
Castro v. County of Los Angeles, 833 F.3d. 1060 (9th Cir.2016) ..................................... 18

13

14
C.B. v. City of Sonora, 769 F.3d 1005 (9th Cir. 2014) ........................................ 22

15
Chaudhry v. City of Los Angeles, 751 F.3d 1096 (9th Cir. 2014) ..................................... 20

16
Clouthier v. County. of Contra Costa, 591 F.3d 1232 (9th Cir.2010)................................ 18

17

18
Conrad v. Ball Corp., 24 Cal. App. 4th 439 (1994)........................................ 22

19
Cunningham v. Gates, 229 F.3d 1271 (9th Cir. 2000) ........................................ 16

20
Cyrus v. Town of Mukwonago, 624 F. 3d 856 (7th Cir. 2010)........................................ 18

21

22
Davis, 2012 WL 4462520, at *3 ........................................ 22

23
Estelle v. Gamble, 429 U.S. 97 (1976) ........................................ 12

24
Ewolski v. City of Brunswick, 287 F.3d 492 (6th Cir. 2002)........................................ 14

25

26
Gantt v. City of Los Angeles, 717 F.3d 702 (9th Cir. 2013)........................................ 13, 14

27
Getty Petroleum Corp. v. Island Transp. Corp., 862 F.2d 10 (2d Cir. 1988)..................... 22

28
Goad v. Macon County, 730 F.Supp. 1425, 1426 (M.D. Tenn. 1989)................................ 23

Gordon v. Cty. of Orange, 888 F.3d 1118 (9th Cir. 2018) .......................................11, 12, 13

Graham v. Connor, 490 U.S. 386 (1989)..........................................................................12, 15

Harper v. City of Los Angeles, 533 F.3d 1010 (9th Cir. 2008)..........................................19

Hayes v. County of San Diego, 736 F.3d 1223 (9th Cir. 2013) ........................................14

Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir. 1999) ..............................13, 20, 21

Hoffman v. McNamara, 688 F.Supp. 830 (D. Conn. 1988) ................................................23

Jones v. Williams, 297 F.3d 930 (9th Cir.2002)..................................................................19

Kelson v. City of Springfield, 767 F.2d 651 (9th Cir. 1985)..............................................13

Kennedy v. S. California Edison Co., 268 F.3d 763 (9th Cir. 2001)  .................................19

Kingsley v. Hendrickson, 135 S. Ct. 2466 (2015).........................................................12, 15

Monroe v. Pape, 365 U.S. 167 (1961) ................................................................................19

Motley v. Parks, 383 F.3d 1058 (9th Cir. 2004)................................................................16

Ovando v. City of Los Angeles, 92 F. Supp. 2d 1011 (C.D. Cal. 2000)............................20

Pierce v. Multnomah County, 76 F.3d 1032 (9th Cir. 1996)..............................................16

Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008)....................................................14

Sanchez v. Pereira-Castillo, 590 F. 3d 31 (1st Cir. 2009) .................................................18

Saucier v.Katz, 533 U.S. 194 (2001) ..................................................................................22

Smith v. City of Fontana, 818 F.2d 1411 (9th Cir. 1987).............................................13, 20

Stevenson v. Koskey, 877 F.2d 1435 (9th Cir. 1989).........................................................19

United States v. Koon, 34 F.3d 1416 (9th Cir. 1994).........................................................16

Velez v. Roche, 335 F. Supp. 2d 1022 (N.D. Cal. 2004) ...................................................22

iv

Wilkinson v. Torres, 610 F.3d 546 (9th Cir. 2010) ........................................................ 13, 14

**Statutes**

42 U.S.C. § 1983 ........................................................................................... 11, 17,19

42 U.S.C. § 1988 ........................................................................................... 21

**Jury Instructions**

Ninth Circuit Manual of Model Jury Instructions No 9.2 ................................................... 19

Ninth Circuit Manual of Model Jury Instructions No 9.25 ........................................... 15, 16

Ninth Circuit Manual of Model Jury Instructions No 9.29 ................................................... 15

Ninth Circuit Manual of Model Jury Instructions No 9.30 ................................................... 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF CONTENTIONS OF FACT AND LAW

### I. CONTENTIONS OF FACT AND SUMMARY OF EVIDENCE

This is a civil rights action brought under 42 U.S.C. Section 1983 for the violation of Decedent Phillip Soto Garcia, Jr.'s constitutional rights and those of Plaintiffs, Mary Garcia (spouse of Decedent), Phillip James Garcia (adult son of Decedent) and Angelo Garcia (adult son of Decedent).

### A. Defendants' Used Excessive Force/Failed to Intervene to Stop the Use of Excessive Force Against Decedent, Thereby Causing His Death

On March 22, 2017, Decedent, Phillip Soto Garcia, Jr. ("Mr. Garcia") was a 51 year old pre-trial detainee suffering from a mental health crisis when he was booked into Larry D. Smith Correctional Facility ("LSCF") following his arrest by Cathedral City police officers for an assault of his elderly roommate, Dwight Walker.  Prior to being booked into jail, Mr. Garcia was taken to Desert Regional Medical Center and was given medical clearance for booking (an "ok to book").  At approximately 12:40 p.m. on March 22, 2017, Mr. Garcia arrived at LSCF and was placed in solitary confinement in Sobering Cell #1.

Mr. Garcia was allegedly unable to complete his booking process at the jail because of his unusual responses to the booking questions. The inmate classification assessment form was marked "yes"  under item #10 "Current Medical/Mental Health Issues".  Next to that entry it was noted that Mr. Garcia "displayed bizarre behavior" and that he "refused to answer questions".  He was classified as Protective Custody Level 3.  The booking process was apparently never completed because of his behavior. Mr. Garcia allegedly remained agitated and incoherent throughout the time he was in the Sobering Cell.  According to the defendants, on the morning of March 23, 2017, while Mr. Garcia was still in Sobering Cell #1, Mr. Garcia was standing atop a three-foot privacy wall in the cell pulling at a ceiling light fixture to the point that it caused his hand to bleed.

Sobering Cell #1 is a small, fully enclosed cell measuring only 12 feet wide by 8 feet deep by 8 feet high.  Sobering Cell #1 shares an adjoining wall to Defendant Sergeant Ayala's office and Defendant Ayala was the on-scene supervisor during the incident.  Mr.

1

Garcia remained in solitary confinement in Sobering Cell #1 until approximately 6:34 a.m. on March 23, 2017 – which was a total of almost 18 hours from the time that he was first booked into LSCF.  At approximately 6:34 a.m. on March 23, 2017, Mr. Garcia was violently extracted from Sobering Cell #1 by the Emergency Response Team ("ERT").

The force used during the extraction was excessive and unreasonable and consisted of the use of:  30 rounds of pepperballs fired under the door into the cell in which Mr. Garcia was housed, a stinger grenade which was deliberately thrown directly at Mr. Garcia in the small cell at the direction of Sergeant Ayala, a stun shield which smashed Mr. Garcia in the face, knocking him backward onto the floor of the sobering cell, multiple punches by multiple deputies while on the floor of the sobering cell, a taser, an "attempted" carotid restraint hold, a salivary gland control hold, emergency restraint chair ("ERC") and a spit mask.  A more detailed account of the force used during the extraction is provided below.

After the extraction, Mr. Garcia was forced into the ERC with his hands hand-cuffed behind his back and all four of his limbs were then restrained to the ERC.  During placement in the ERC he was punched multiple times by multiple deputies.  With the exception of the pepperball rounds which were fired shortly before the ERT team arrived in full gear, all of the foregoing force used against Mr. Garcia occurred within a matter of approximately 5 minutes.  Mr. Garcia was then shoved in the ERC into Safety Cell #3 across the hallway from the sobering cell.  He remained in the ERC in Safety Cell #3 for approximately another 3 hours until he was eventually transported to Riverside University Health Services ("RUHS"), still in the ERC with waist and ankle shackles applied and a spit mask covering his face at approximately 9:40 a.m. on March 23, 2017.

Mr. Garcia's admitting diagnosis when he arrived at RUHS was rhabdomyolysis (which is the rapid destruction of skeletal muscle) and acute kidney injury ("AKI"), neither of which he had when he left Desert Regional Medical Center and entered the jail.  At the hospital, Mr. Garcia remained continuously restrained in 4-point restraints from the time of his arrival at the hospital on March 23, 2017 at approximately 10:40 a.m. to the time of his

death on March 24, 2017 at approximately 3:06 a.m.  Plaintiffs contend that Mr. Garcia died as a direct result of the excessive force used against Mr. Garcia while at the jail.

It has been alleged by the defendants that Mr. Garcia, was a threat and danger to himself and therefore had to be removed from the sobering cell for his own safety and the safety of the jail staff. It has been further alleged that the decedent was charging and smashing his head on the cell door and not responding to the deputies' orders to stop banging his head on the door. However, no videos have been provided depicting Mr. Garcia banging his head on the cell door by the deputies nor the county employer as they are the only person(s) who have access to such videos. Several hours of video footage has been provided of the extraction and subsequent actions/inactions taken by the defendants, however conveniently, the footage of what defendants have alleged to occur which was the basis of the need for the extraction was not produced.

No evidence exists to show that Mr. Garcia was medically assessed or even medically approved to remain in the sobering cell for such an extended period. Title 15, in addition to the policy and procedures in place, requires that an inmate be medically approved to remain in a sobering cell more than six (6) hours and a more extensive medical assessment needs to take place if the inmate remains in the sobering cell beyond twelve (12) hours. It should have been clearly obvious to the jail administration or staff that Mr. Garcia was not "sobering up" in the sobering cell after just a few hours and should have been immediately transferred to the hospital for evaluation within a reasonable period of time, not twenty-one hours later.

When the decision was made by Defendant Sergeant Ayala and Defendant Steele to assemble the ERT to extract Mr. Garcia from the sobering cell on March 23, 2017, a briefing was held before the extraction began.  Based on Defendants' testimony, it appears the briefing took at a minimum 10 minutes, during which time the ERT team assembled at the ERT locker and put on their gear.  The extraction team is specially equipped with heavy body armor, helmets, face shields hazard material suits and gloves. For this extraction they were issued weaponry that included pepper ball guns, tasers, a stun shield,

and stinger grenades.  After assembling the team and holding the briefing, the team approached the sobering cell to effectuate the extraction of Mr. Garcia. Thirteen (13) deputies were assigned to the ERT team. They are all named defendants in the matter except for Deputy Maldonado and Deputy Kramer who the parties have agreed to dismiss from the action.  The remaining defendants and participants are the following: Defendants Ayala, Steele, Bergert, Caverley, Cordero, Figueroa, Hinson, Llanos, Lopez, Rodarte-Lugo, Miranda, Pearson, Tarango, and Varoni. Deputy Tesillo is also a named Defendant and was involved with continuing to maintain Mr. Garcia in the ERC with a spit mask on for hours at RUHS during which time no range of motion of Mr. Garcia's limbs was provided and no food or water was administered to Mr. Garcia.

It is clear from the Defendants' deposition testimony that none of the Defendants knew anything about the circumstances of Mr. Garcia's arrest (his arresting charges) before commencing the extraction.  It is undisputed that Mr. Garcia was alone in the Sobering Cell when the extraction occurred.  All of the Defendants testified that they were briefed that Mr. Garcia was injuring himself (banging his head on the cell window) before the extraction occurred.  Some of the Defendants testified that they actually witnessed Mr. Garcia hitting his head before the extraction occurred.  The medical office at the jail is approximately 20-30 feet from Sobering Cell #1 where the extraction occurred.  All of the deputies involved in the extraction testified that none of them contacted medical staff to come and evaluate Mr. Garcia for his medical or mental health needs prior to Mr. Garcia being extracted from the cell.  A medical/mental health crisis should have been obvious to the defendants however they ignored their basic training skills and failed to summon medical or mental health attention for Mr. Garcia.  No medical intervention or evaluation was even attempted by the deputies prior to the vicious extraction of Mr. Garcia.

The extraction began when Mr. Garcia's cell was saturated with approximately 30 pepper ball rounds by Defendant Pearson, which was approved by Sergeant Ayala. Thereafter, a stinger grenade was thrown in Mr. Garcia's direction in the cell at the orders of Sergeant Ayala. Sergeant Ayala specifically informed the ERT team where to throw the

grenade by identifying Mr. Garcia's position in the small cell beforehand.  The literature on a stinger grenade states that improper use can cause severe injury and/or death. The "#15 Stinger Grenade" used on Mr. Garcia during his extraction is described in product literature as a "maximum effect device". This device delivers up to four stimuli for psychological and physiological effect. It also deploys approximately 180 rubber pellets, light, sound and an optional chemical agent. The grenade sprays rubber pellets in a 50-foot radius and delivers 175 decibels of sound at 5 feet. Product literature for the stinger grenade states that improper use can result in "death or serious bodily injury". The Centers for Disease Control and Prevention has stated that exposure to sounds at 120 decibels higher in close proximity to the ear causes pain and ear injury. The Stinger grenade thrown by Deputy Figueroa detonated within 2 feet from Mr. Garcia. Video of the incident shows that when stinger grenade exploded, Mr. Garcia attempted to exit the cell. However, when Mr. Garcia attempted to comply and exit the cell **with his hands on his head**, he was propelled to the ground with a stun shield and aggressively piled upon by several deputies. Mr. Garcia was then punched several times on his body and in the head while the deputies were extracting him from the cell. Multiple defendants testified that they each were giving Mr. Garcia commands while the extraction was occurring.  Mr. Garcia was also tased during the extraction with an X2 Taser which can cause serious injury or even death. Subsequent to extraction from the sobering cell, no decontamination measures were used to get the chemical toxins off Mr. Garcia.

The defendants' all prepared "Use of Force Reports" as required per the department policy. The reports provide that the force used against Mr. Garcia by each defendant is as follows:  Deputy Bergert's report indicates that he used the force of his body weight and punched Mr. Garcia in the head with his closed fist several times; Deputy Caverley reported that he used the force of his body weight on top of Mr. Garcia combined with the weight of the other deputies who were piled on top of Mr. Garcia; Deputy Cordero indicated that during the extraction, he punched Mr. Garcia with his closed fist on the left

side of Mr. Garcia's abdomen at least 3 times and used the force of his body weight on Mr. Garcia's body to hold him down.

Deputy Figueroa deployed the Stinger grenade and used the force of his body weight in addition to the other deputies that were on top of Mr. Garcia as well; Deputy Hinson testified and reported that he punched Mr. Garcia at least 4-5 times on the right side of his face and back with his closed fist while Mr. Garcia was tackled to the ground by several other deputies. Deputy Hinson also attempted to apply a carotid restraint hold (the potentially lethal force where the sides of the neck are squeezed to cut off blood flow to the brain). While Mr. Garcia was being strapped to the ERC, Deputy Hinson also punched Mr. Garcia at least four times on the right side of his abdomen with his closed fist. While Mr. Garcia was handcuffed and being strapped to the ERC, Defendant Steele punched Mr. Garcia three (3) times in the head, and then also applied a salivary gland control hold to Mr. Garcia while Mr. Garcia's legs were being strapped to the ERC. Deputy Llanos testified and reported that he used the force of his body weight to secure Mr. Garcia to the ERC and used control holds against Mr. Garcia. These control holds are known to cause pain and submission by the inmate. Deputy Lopez reported that he used the Stun Shield and used the force of his body weight atop of Mr. Garcia in addition to the weight of the other deputies. Deputy Rodarte-Lugo stated that he used his body weight on Mr. Garcia and also pinned Mr. Garcia down by his legs while Deputy Figueroa tased Mr. Garcia at the same time.  Deputy Miranda reported that she used the force of her body weight atop of Mr. Garcia. Deputy Pearson fired at least 30 rounds of pepperball into the safety cell and while Mr. Garcia was in the restraint chair he applied a "salivary gland pressure point" (pain) hold. Deputy Tarango testified and reported that he used the force of his body weight against Mr. Garcia. Deputy Varoni applied the salivary gland pressure point maneuver on Mr. Garcia while Mr. Garcia was already restrained in the ERC restraint chair.

After the extraction and while placing Mr. Garcia in the ERC, the deputies continued with their torturous treatment of Mr. Garcia by repeatedly punching him, using a

salivary gland hold on him, and even going so far as to pointing the taser at him and threatening to tase him again, even while he was fully restrained in the ERC chair.  Mr. Garcia was originally restrained in the ERC with his hands handcuffed behind his back. He was wheeled in the chair across the hall and into Safety Cell #3. Mr. Garcia remained bound in the chair, without adequate hydration, food, psychiatric intervention, medical monitoring, or supervision and without basic human care for approximately 3 hours. During that time, although jail policy required deputies to untie one limb for range of motion exercises every 30 minutes, all four of Mr. Garcia's limbs remained bound.

During the entire time that Mr. Garcia was in the safety cell and restrained to the ERC, he was not provided with any food or water. Mr. Garcia was not given any Range of Motion nor were any limbs ever released for the range of motion to be conducted. There were no reasonable attempts to hydrate Mr. Garcia during that entire time. Mr. Garcia was basically placed in the ERC and left to deteriorate while the deputies ignored all signs of suffering that Mr. Garcia exhibited.  Mr. Garcia remained in the ERC for a total of approximately 7 hours, perhaps even longer. Thereafter he was finally transferred onto a hospital gurney at Riverside University Health System ("RUHS") in the Detention Health Unit portion of the facility at approximately 1:21 pm on March 23, 2017. Jail policy 503.07 provides that an inmate may not be restrained in an ERC in excess of 4 hours. Even after being transferred to the hospital gurney and later to a hospital bed, all of Mr. Garcia's limbs remained completely restrained, without range of motion exercises ever being performed. Mr. Garcia suffered for another 13 hours 45 minutes until the time of his death on March 24, 2017 at 3:06 a.m.

The cause of death on Mr. Garcia's death certificate remained as "pending" for approximately one year after his death.  An amendment to the death certificate was issued in 2018. The Amendment to the Death Certificate listed the cause of death as follows: (a). Sudden death in schizophrenia; (b). Rhabdomyolysis in association with physical exertion by subject and application of control methods; (c). Seizure disorder; (d). Hypertensive

cardiovascular disease; (e) Homicide (f). Self-initiated physical exertion with control methods applied by law enforcement while in custody.

### B.  Defendants Were Deliberately Indifferent to Decedent's Medical Needs

It was apparent from Mr. Garcia's behavior that some medical/mental health crisis was ongoing with him. Mr. Garcia gave bizarre answers during booking and the process was not completed as a result of Mr. Garcia's behavior. From the beginning of Mr. Garcia's intake process the jail staff, deputies, and sergeants were all on notice than Mr. Garcia was exhibiting strange and abnormal signs and potentially suffering from a mental health crisis.

All deputies involved in the extraction testified that none of them contacted the medical staff to come and evaluate Mr. Garcia for his medical/mental health needs prior to Mr. Garcia being extracted from the cell.  A medical crisis should have been obvious to the defendants however they ignored their basic training skills and failed to summon medical attention for Mr. Garcia.  No medical intervention or evaluation was even attempted by the deputies prior to the vicious extraction of Mr. Garcia.

Mr. Garcia's desperate behavior at the jail before and during the use of force incident is entirely consistent with the evidence that he had an ongoing medical/mental health emergency and needed immediate medical care. This would have been obvious to Defendants who should have responded immediately. Instead of taking steps to provide Mr. Garcia with the needed medical attention he deserved, the Defendants continued to use force, applying the Taser, using control holds, and punching Mr. Garcia in the head.  This all occurred after Mr. Garcia's cell had already been fired upon with over 30 pepper ball saturation rounds and a stinger grenade explosion in his cell.

The deputies involved are first aid trained, trained in dealing with mentally ill persons, and have had experience in dealing with other disruptive inmates in the past. All defendants testified that the behavior exhibited by Mr. Garcia was out of the norm and nothing that they have seen before. Each deputy defendant agreed in deposition testimony that Mr. Garcia was not acting normal. Despite all of the signs that Mr. Garcia exhibited,

none of the deputies, especially Sergeant Ayala and Deputy Steele felt the need nor urgency to contact medical staff to have Mr. Garcia evaluated prior to extracting him from the cell.

Furthermore, despite their explicit training, none of the Defendant deputies even attempted to communicate with medical staff to seek their opinions or advice as to what Mr. Garcia may be suffering from or whether or not a medical emergency was happening. This was contrary to their training and common sense. This evidence shows that Defendants' were deliberately indifferent to Mr. Garcia's medical and mental health needs Deputies are trained to recognize and handle persons dealing with mental health issues or suffering from a mental health crisis. All of the named defendants failed to exercise their specific training and practice by providing Mr. Garcia with the medical care he required. Rather, the named defendants chose to ignore all signs of Mr. Garcia's medical emergency and leave him in a sobering cell well beyond the time limits set forth by the department without any medical assessment as required by their own policies in accordance with their training. Thereafter, the named defendants made a conscious decision to keep Mr. Garcia restrained for several hours thereafter even though he continued to show signs of a medical emergency and failed to summon medical emergency personnel or transport Mr. Garcia to the hospital within a reasonable time. Defendant's failed at recognizing the medical crisis Mr. Garcia was in and failed to follow their basic training, state law and the policies in place to prevent such tragedies.

### C. Causation

Defendants' use of force against Mr. Garcia resulted in his subsequent death. It is undisputed that Mr. Garcia was in a medical/mental crisis prior to the use of force and was subjected to a significant amount of force during the extraction. Mr. Garcia was subjected to an additional amount of force even after he was extracted and strapped to an ERC chair. Mr. Garcia remained strapped for several hours before being transported to the hospital for medical evaluation.  Plaintiffs' evidence on this subject includes but is not limited to the following evidence and expert opinions.

Prior to the use of force administered by the defendant deputies, the decedent was displaying signs of mental health issues that required a mental health assessment and medical intervention. This was recognized by each of the defendants per their deposition testimony. Each defendant testified that they did not summon any medical staff or personnel before the extraction. Expert medical opinion testimony concludes that Mr. Garcia died as a result of Hypoxic-Ischemic Cerebral Injury due to Combined and Sustained Chemical-Mechanical-Positional Restraint Asphyxiation. Metabolic Encephalopathy and Traumatic Brain Injury due to Blunt Force Trauma of the head were contributory factors to his death. This all relates back to the use of force used against Mr. Garcia by the defendant deputies during their extraction in addition to the failure of the defendants to summon medical staff or transfer Mr. Garcia to the hospital in a reasonable amount of time where he could have received the medical treatment he was in dire need of.

The Coroner, Dr. McCormick determined that the "manner" of death was a homicide, and according to expert testimony, therefore the underlying cause of death "shall not be "Sudden Death in Schizophrenia" because Sudden Unexplained Death in Schizophrenia is a natural disease that cannot be classified as a homicide. The underlying cause of death in this case and the manner of death as have been presented by Dr. McCormick are incongruent and inconsistent. While the manner of death was correctly classified as a homicide by Dr. McCormick, his underlying cause of death is grossly inaccurate. Moreover, the forensic neuropathology report in this case confirmed that Phillip Soto Garcia, Jr. suffered from hypoxic-ischemic cerebral injury. The brains of subjects who die as a result of Sudden Unexplained Death in Schizophrenia do not exhibit hypoxic-ischemic cerebral injury. According to Plaintiffs' medical expert, Phillip Soto Garcia's brain, in addition, did not exhibit findings that are frequently seen in the brains of schizophrenics.

Expert testimony will conclude that Mr. Garcia suffered a brain injury in addition to other ongoing trauma which cumulatively contributed and ultimately caused his death. The totality of the actions/inactions taken by each individual defendant contributed to the

ultimate tragic death of Mr. Garcia. Each defendant had a duty to intervene and prevent the ongoing torture of Mr. Garcia and none of the defendants even attempted to intervene or even suggest that Mr. Garcia be transported to the emergency room for medical care before brutalizing Mr. Garcia during the cell extraction. Mr. Garcia's suffering never ended until his passing.

## II.     CONTENTIONS OF LAW

Plaintiffs' Second Amended Complaint asserts federal claims under 42 U.S.C. § 1983. The Claims are based on the key facts and evidence set forth above in Section I. This Court refused to accept jurisdiction over Plaintiffs' state law claims early on in the case, thus, only claims arising under Federal law are at issue in this trial.

### A.  Federal Civil Rights Claims – Individual Defendants (42 U.S.C. § 1983, 4th and 14th Amendments)

#### 1.  First Claim for Relief – Deliberate Indifference to Medical Needs

In the First Claim for relief, Plaintiffs allege that the individual defendants deprived Decedent Phillip Soto Garcia, Jr. ("Mr. Garcia") of his rights to adequate medical care in violation of the Fourteenth Amendment by denying/delaying medical and mental health care for Mr. Garcia.

To hold Defendants liable, Plaintiffs must prove:  (i)The defendant made an intentional decision with respect to the conditions under which Phillip Soto Garcia, Jr. was confined (namely, the medical/mental health treatment that was not provided to Phillip Soto Garcia, Jr.); (ii) Defendant's decision put Phillip Soto Garcia, Jr. at substantial risk of suffering serious harm; (iii) Defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious; and (iv) By not taking such measures, the defendant caused Phillip Soto Garcia, Jr.'s injuries.  See Ninth Circuit Manual of Civil Jury Instructions No. 9.30, and Gordon v. Cty. of Orange, 888 F.3d 1118, 1125 (9th Cir. 2018) (holding that an objective reasonableness standard applies).

### 2.  Second Claim for Relief – Wrongful Death/Cruel and Unusual Punishment

In the Second Claim for Relief, Plaintiffs allege that Defendants deprived Mr. Garcia of his rights under the U.S. Constitution to be free from cruel and unusual punishment and punishment without due process under the Fourteenth Amendment to the U.S. Constitution.  Plaintiffs' Second Claim asserts such liability on the part of Defendants based on their (a) use of excessive force against Mr. Garcia and (b) their failure to provide Mr. Garcia with adequate medical care.

The Supreme Court has held, "It is clear … that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." Graham v. Connor, 490 U.S. 386, 395 n.10 (1989). Deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain".  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  The Estelle court held that "…[t]his is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care…"  Estelle v. Gamble, supra, at 104–05.  In Kingsley v. Hendrickson, 135 S. Ct. 2466, 2472 (2015), the Supreme Court held that to prove an excessive force claim under the Fourteenth Amendment, a pretrial detainee must show that the officers' use of force was "objectively" unreasonable; the detainee is not required to show that the officers were "subjectively" aware that their use of force was unreasonable.  Similarly, in Gordon v. Cty. of Orange, 888 F.3d 1118, 1125 (9th Cir. 2018) the 9th Circuit set forth an objective deliberate indifference standard for violations of a pretrial detainee's right to adequate medical care.

To hold Defendants liable on grounds that the *excessive force* used against Mr. Garcia amounted to punishment, Plaintiffs must prove the elements of an excessive force claim (discussed in detail in Section II (A)(4), below.  In summary, Plaintiffs must prove that that the defendants used force that was not objectively reasonable under all of the circumstances known to them.

To hold Defendants liable on grounds that their failure to provide adequate medical/mental health care to Mr. Garcia amounted to unnecessary and wanton infliction

of pain, Plaintiffs must prove the elements of a claim for deliberate indifference to medical needs (which is discussed in detail in Section II(A)(1), above. Again, under Gordon v. Cty. of Orange, 888 F.3d 1118, 1125 (9th Cir. 2018), an objective reasonableness standard applies to the Defendants' conduct.

### 3. Third Claim for Relief – Interference with Familial Right of Association

In the Third Claim for Relief, Plaintiffs contend that Defendants deprived Plaintiffs of their rights to a familial relationship with the Decedent in violation of the First and Fourteenth Amendment, entitling Plaintiffs to wrongful death damages.

Under the Due Process Clause of the Fourteenth Amendment, a person has the right to be free from governmental interference with their familial relationships. In order to prove that the defendants deprived Plaintiffs of their Fourteenth Amendment rights, Plaintiffs must prove by a preponderance of the evidence that: (i) Defendant violated one or more of Phillip Soto Garcia, Jr.'s rights (i.e., right to be free from excessive force or right to adequate medical care); and (ii) Defendant acted with deliberate indifference to Phillip Soto Garcia Jr.'s rights.  (See Comments to 9th Cir. Model Instruction 9.32 (Fourteenth Amendment Interference with parent/child relationship).

Parents and children possess a constitutionally protected liberty interest in companionship and society with each other. Smith v. City of Fontana, 818 F.2d 1411, 1418 (9th Cir. 1987), overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir. 1999) (en banc). In Kelson v. City of Springfield, 767 F.2d 651 (9th Cir. 1985), the Ninth Circuit held that the state's interference with such liberty interest without due process of law is cognizable under 42 U.S.C. § 1983.  Substantive due process claims typically involve egregious conduct or the use of excessive force. But official conduct only violates substantive due process when it "shocks the conscience." Gantt v. City of Los Angeles, 717 F.3d 702, 707 (9th Cir. 2013) (citing Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010)).

Under the overarching test of whether the official's conduct "shocks the conscience" are two standards: the more demanding "purpose to harm" standard and the lesser

"deliberate indifference" standard. <u>Porter v. Osborn</u>, 546 F.3d 1131, 1137 (9th Cir. 2008). The critical consideration is whether the circumstances are such that actual deliberation by the officer is practical. <u>Hayes v. County of San Diego</u>, 736 F.3d 1223, 1230 (9th Cir. 2013). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." <u>Wilkinson</u>, 610 F.3d at 554 (citing <u>Porter</u>, 546 F.3d at 1137). When the facts of a case "falls within the "middle-range" between custodial settings and high-speed chases, "the more appropriate standard of review is 'deliberate indifference.'" <u>Ewolski v. City of Brunswick</u>, 287 F.3d 492, 510-11 (6th Cir. 2002).

Here, Plaintiffs propose the "deliberate indifference" standard because it is undisputed that a briefing occurred before the cell extraction commenced wherein the team had time to put on their gear and prepare for the extraction. Therefore, the defendants had ample opportunity to have time for deliberation regarding how the extraction would be performed before it commenced and whether or not to obtain medical or mental healthcare for Decedent <u>before</u> even starting the extraction. Furthermore, after Mr. Garcia was fully restrained in the ERC, there was ample opportunity for Defendants to deliberate regarding whether to call for medical/mental health care immediately post-extraction, or whether to roll Mr. Garcia into Safety Cell 3 and leave him there suffering for an extended period of time with all 4 limbs restrained and taser prongs still embedded in his skin. Defendants made a deliberate choice to do the latter.

Deliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions. It entails something more than negligence but is satisfied by something less than acts or omission for the very purpose of causing harm or with knowledge that harm will result. (<u>Gantt</u>, supra at 708.)

**4.  Fourth Claim for Relief – Excessive Force**

In the Fourth Claim for Relief, Plaintiffs allege that Defendants used excessive force on Mr. Garcia in violation of Mr. Garcia's rights under the Fourth Amendment and Fourteenth Amendments to the United States Constitution.  Plaintiffs also allege that Defendants were "integral participants" in the excessive force.

To hold Defendants liable, Plaintiffs must prove that the defendants used force that was not objectively reasonable under all of the circumstances known to them.  See Ninth Circuit Manual of Model Jury Instructions No 9.25, 9.29.   "It is clear … that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." Graham v. Connor, 490 U.S. 386, 395 n.10 (1989). More recently, in Kingsley v. Hendrickson, 135 S. Ct. 2466, 2472 (2015), the Supreme Court held that to prove an excessive force claim under the Fourteenth Amendment, a pretrial detainee must show that the officers' use of force was "objectively" unreasonable; the detainee is not required to show that the officers were "subjectively" aware that their use of force was unreasonable.  Factors to consider in determining whether the defendant used excessive force include, among others:

(1) the circumstances known to the officers at the time force was applied;

(2) whether the decedent posed an immediate threat to the safety of the officers or to others;

(3) whether the decedent was actively resisting arrest or attempting to evade arrest by flight;

(4) the amount of time the officer had to determine the type and amount of force that reasonably appeared necessary, and any changing circumstances during that period;

(5) the type and amount of force used;

(6) the availability of alternative methods to subdue the decedent;

(7) whether it was practical for the officers to give warning of the imminent use of force, and whether such warning was given;

(8) whether it should have been apparent to the officers that the person they used force against was emotionally disturbed;

(9) the risk of injury posed by the type of force used; and

(10) whether the officers attempted to deescalate the situation prior to or during the use of force.  (See Ninth Circuit Manual of Model Jury Instructions No 9.25) The Ninth Circuit held in Pierce v. Multnomah County, 76 F.3d 1032, 1043 (9th Cir. 1996), that the Fourth Amendment applies to excessive force cases involving situations of "warrantless, post-arrest, pre-arraignment custody."

**5.  Fifth Claim for Relief – Failure to Intervene to Stop Excessive Force**

In the Fifth Claim for Relief, Plaintiffs allege that Defendants failed to intervene and prevent the use of excessive force by each other in violation of Mr. Garcia's rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.

A law enforcement officer has an affirmative duty to intervene on behalf of a citizen whose constitutional rights are being violated in his presence by other officers.  See, Motley v. Parks, 383 F.3d 1058, 1071 (9th Cir. 2004).  "Pursuant to a long line of civil cases, police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." ; Cunningham v. Gates, 229 F.3d 1271, 1289-90 (9th Cir. 2000) (recognizing officers' duty to intercede where they have an opportunity to stop a violation of rights).

Each of the Defendants, including Sergeant Ayala, who stood by and watched their fellow officers use force are also liable for the violations of Mr. Garcia's rights. When it comes to violations of civil rights, "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." United States v. Koon, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), judgment aff'd in part, rev'd in part on other grounds, 518 U.S. 81 (1996). As the Ninth Circuit has held:

"[T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows. Thus an officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from

unreasonable force in the course of an arrest would, like his colleagues, be responsible for subjecting the victim to a deprivation of his Fourth Amendment rights."

Here, each of the individual Defendants personally witnessed the excessive force that occurred during the cell extraction and/or continued in the use of excessive force while Mr. Garcia was in the safety cell after the extraction and/or at the hospital post-extraction (namely, Tesillo & Ayala while at the hospital).  Those who did not enter the cell during the extraction nevertheless encouraged, facilitated, and failed to abort the excessive force that occurred therein.

Sergeant Ayala personally directed and/or ratified all of the uses of force that occurred during the extraction and the continued use of force (ERC, spit mask, failure to provide range of motion) while Mr. Garcia was at the hospital.  Indeed, Sergeant Ayala gave the extraction team specific orders on where to aim the stinger grenade before it was thrown and can be witnessed on the handheld video of the extraction participating in forcing Mr. Garcia into the Emergency Restraint Chair immediately after the cell extraction.  Thus, Sergeant Ayala witnessed the excessive force and was an "integral participant" in its use both before the extraction commenced and afterward.  Sergeant Ayala failed to abort the excessive force carried out by the deputies.

Plaintiffs have alleged "integral participation" of each of the named Defendants. (SAC ¶ 147, Docket 67).  Liability under section 1983 also may arise from "integral participation" in a violation of the decedent's particular rights under the constitution. Integral participation means that the defendant officer participated in some meaningful way in the constitutional violation, but it does not require that each officer's actions themselves rise to the level of a constitutional violation. Rather, all those who actively participate in a wrongful act, by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts for their benefit, are equally liable with him. Boyd v. Benton County, 374 F.3d 773, 780 (9th Cir. 2004) ("Specifically, 'integral participation' does not require that each officer's actions themselves rise to the level of a

constitutional violation."); See also, <u>Blankenhorn v. County of Orange</u>, 485 F. 3d 463, , 481 n. 12 (9th Cir. 2007).

### 6.  Sixth Claim for Relief – Failure to Protect

In the Sixth Claim for relief, Plaintiffs allege that the individual defendants failed to protect Mr. Garcia from harm in violation of his rights under the Fourteenth Amendment.

To hold Defendants liable, Plaintiffs must prove:  (i) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) Those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) By not taking such measures, the defendant caused the plaintiff's injuries. With respect to the third element, the defendant's conduct must be objectively unreasonable.  See Ninth Circuit Manual of Civil Jury Instructions No. 9.31.  In <u>Castro v. County of Los Angeles</u>, 833 F.3d. 1060, 1070 (9th Cir.2016) (en banc), the Ninth Circuit overruled <u>Clouthier v. County. of Contra Costa</u>, 591 F.3d 1232, 1253-54 (9th Cir.2010), "to the extent that it identified a single deliberate indifference standard for all § 1983 claims and to the extent that it required a plaintiff to prove an individual defendant's subjective intent to punish in the context of a pretrial detainee's failure-to-protect claim." <u>Castro</u> at 1070. The Ninth Circuit in <u>Castro</u> also approved a jury instruction for a pretrial detainee's claim of failure to protect. See Instruction 9.31 (Particular Rights—Fourteenth Amendment—Pretrial Detainee's Claim of Failure to Protect).

### B.  Causation

Federal courts have found that proximate cause under §1983 incorporates common-law tort causation principles.  <u>Cyrus v. Town of Mukwonago</u>, 624 F. 3d 856, 864 (7th Cir. 2010) (common-law tort causation rules apply to 1983 claims; general rule is that expert testimony is not necessary to prove causation); <u>Sanchez v. Pereira-Castillo</u>, 590 F. 3d 31, 50 (1st Cir. 2009) (common law tort causation principles apply under 1983; causal

connection may consist of state actor setting in motion series of acts by others which state actor knows or reasonably should know would cause others to inflict constitutional injury); This position is consistent with the Supreme Court's direction and 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions."  Monroe v. Pape, 365 U.S. 167, 187 (1961).

See also comments to 9th Circuit Manual of Model Jury Instructions, No. 9.2.  "To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation." Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008) This standard of causation "closely resembles the standard 'foreseeability' formulation of proximate cause." Arnold v. Int'l Bus. Mach. Corp., 637 F.2d 1350, 1355 (9th Cir. 1981); see also Stevenson v. Koskey, 877 F.2d 1435, 1438 (9th Cir. 1989) (noting that federal courts turn to common law of torts for causation in civil rights cases).

Additionally, many factors or things or the conduct of two or more persons can operate at the same time either independently or together to cause injury or damage.  In such a case, the conduct of each factor, thing, or person is a cause of the injury regardless of the extent to which each contributes to the injury. (See, Ninth Circuit Manual of Model Civil Jury Instructions, Instruction No. 9.2 (Comment); Jones v. Williams, 297 F.3d 930, 937 n.6 (9th Cir.2002).  Kennedy v. S. California Edison Co., 268 F.3d 763, 768 (9th Cir. 2001) (discussing jury instruction for concurrent causes under California tort law:

"There may be more than one cause of an injury. When conduct of two or more persons or conduct and a defective product contributes concurrently as causes of an injury, the conduct of each is a cause of the injury regardless of the extent to which each contributes to the injury.")

Here, Plaintiffs contend that Defendants use of excessive force, ie; the use of pepper balls; a stinger grenade; stun shield; control holds; an X2 Taser; Physical force including; but not limited to; body and head strikes; Emergency Restraint Chair; Spit mask; Salivary gland control holds, and the combined body weight of several deputy and correctional officers) causing severe injury and ultimately the death of Mr. Garcia. This contention will

be supported at trial by the testimony of Plaintiffs' medical expert Dr. Bennet Omalu and the testimony of County of Riverside Forensic Pathologist Dr. Scott McCormick. The excessive use of force of the deputies will be shown to be against policy and procedures that were set in place to prevent such tragic deaths as in the instant case by Plaintiff's police use of force expert Roger Clark.

### C. Damages

Plaintiffs seek compensatory and punitive damages on behalf of Mr. Garcia's estate and on their own behalf.  Damages in this case include the following:

### 1. Compensatory Damages

#### a. Mr. Garcia's Loss of life, Pre-death Pain and Suffering

Federal claims belonging to the Decedent may be pursued by his estate following his death as a survival action. See <u>Smith v. City of Fontana</u>, 818 F.2d 1411, 1416 (9th Cir. 1987), overruled on other grounds by <u>Hodgers-Durgin v. de la Vina</u>, 199 F.3d 1037 (9th Cir. 1999). Plaintiffs seek compensation for the intense pain, suffering and mental anguish Mr. Garcia suffered during the period leading up to his death and for his loss of life.  (See <u>Chaudhry v. City of Los Angeles</u>, 751 F.3d 1096, 1105 (9th Cir. 2014) (pre-death pain and suffering, loss of life recoverable in § 1983 action).  Mr. Garcia spent his last hours of life in pain being beaten and unreasonably restrained without adequate food, hydration or basic human decadency.  Mr. Garcia's death was tragic and premature. He was only fifty-one (51) years old and would have lived for many more years absent the Defendants' constitutional violations. Mr. Garcia's death has resulted in a substantial amount of medical, funeral, and other expenses that the estate has been partially responsible for.

#### b. Plaintiffs Angelo and Phillip James' Loss of Their Familial Relationship with Their Father and Plaintiff Mary Garcia's Loss of Relationship with her Spouse.

Each of the plaintiffs have a Fourteenth Amendment due process claim based on the deprivation of their relationship with their father/spouse.  (See, <u>Ovando v. City of Los Angeles</u>, 92 F. Supp. 2d 1011, 1018 (C.D. Cal. 2000); <u>Smith v. City of Fontana</u>, 818 F.2d

1411, 1418 (9th Cir.1987), overruled on other grounds by <u>Hodgers-Durgin v. de la Vina,</u> 199 F.3d 1037, 1041 n.1 (9th Cir. 1999) ("constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents.")

### 2. Punitive Damages

Based on the conduct described above, Plaintiffs contend that the individual defendants' conduct was malicious, oppressive, and in reckless disregard of Mr. Garcia's rights, giving rise to punitive damages.

### D. Attorneys' Fees

Attorneys' fees are allowed to a prevailing plaintiff pursuant to 42 U.S.C. § 1988.

### E. Key Evidence Relied on By Plaintiffs in Support of Their Claims

1. Testimony of Plaintiffs;

2. Testimony of Defendants;

3. Testimony of percipient witnesses;

4. Photographs and Videos;

5. Use of Force reports;

6. Dispatch tapes;

7. Recorded interviews;

8. Decedent's medical records;

9. Coroner Reports;

10. Toxicology Reports; and

11. Testimony of experts.


### III. CONTENTIONS OF LAW – AFFIRMATIVE DEFENSES

### A. Defendants' Affirmative Defenses

Defendants have raised qualified immunity and offset as defenses to the action.

1

### B. Qualified Immunity Does Not Apply

Qualified immunity is a legal defense based on the specific evidence presented at trial.  The Supreme Court has articulated a two-step test for qualified immunity. First, the court must determine whether the facts taken in the light most favorable to the party asserting injury show the officer's conduct violated a constitutional right. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). Second, the court must determine whether the right was clearly established. <u>Id</u>.

Here, Defendants previously brought a motion to dismiss Plaintiffs' excessive force claims (Docket 69) which raised the issue of qualified immunity.  This Court denied Defendants' motion to dismiss on January 11, 2019 (Docket 80).  In doing so, this Court held that it would have been clear to a reasonable officer that the conduct against Decedent was unlawful, citing <u>Cabral v. Cty. of Glenn</u>, 624 F. Supp. 2d 1184, 1192 (E.D. Cal. 2009).  Accordingly, since the right to be free from excessive force was clearly established at the time of the incident Defendants will not be entitled to qualified immunity should Plaintiffs prove excessive force was used.

### C. Defendants Are Not Entitled to an Offset Because They Cannot Prove the Settlement with Cathedral City Defendants was For the Same Injury.

"A defendant seeking an offset against a money judgment has the burden of proving the offset." <u>C.B. v. City of Sonora</u>, 769 F.3d 1005, 1032 (9th Cir. 2014) (en banc) (citing <u>Conrad v. Ball Corp.</u>, 24 Cal. App. 4th 439 (1994)); see also <u>Davis</u>, 2012 WL 4462520, at *3; <u>Velez v. Roche</u>, 335 F. Supp. 2d 1022, 1042 (N.D. Cal. 2004) (noting that defendants bear the burden of proving set-off in a Section 1983 case).  A non-settling defendant is only entitled to an offset if two conditions are satisfied. "First, the non-settling defendant must demonstrate that the settlement and award (against which the offset is sought) were for the same injury." <u>Velez</u>, 335 F. Supp. 2d at 1042 (citing <u>Getty Petroleum Corp. v. Island Transp. Corp.</u>, 862 F.2d 10, 15 (2d Cir. 1988); see also <u>Banks Ex Rel. Banks v. Yokemick</u>, 177 F.Supp.2d 239, 264 (S.D.N.Y. 2001) (stating that "the settlement must be predicated on the tortfeasors' liability for damages attributable to the same injury").

22

"Second, the injury must be indivisible such that there is joint and several liability among the settling and non-settling defendants." Id. (citing <u>Goad v. Macon County</u>, 730 F.Supp. 1425, 1426 (M.D. Tenn. 1989) ("[I]f the claims against the settling defendants were separate and distinct claims from the trial defendants, the losing trial defendants cannot call for a set-off . . . ."); see also <u>Hoffman v. McNamara</u>, 688 F.Supp. 830, 831 (D. Conn. 1988) (no offset where plaintiff's injuries are divisible among several defendants).

Here a set-off would be inappropriate because Defendants cannot demonstrate that the Cathedral City settlement was for the same injury. Plaintiffs alleged a clear set of separate facts as against the Cathedral City Defendants relating to Decedent's <u>arrest</u>.  In contrast, the crux of the claims against the individual County Defendants relate to the cell extraction and the delay/failure to provide medical/mental health care to Decedent once he was detained in their custody.

## IV.  ANTICIPATED EVIDENTIARY ISSUES

### A.  Motions In Limine

i.  Plaintiffs have filed 3 motions in limine as follows:

- Motion In Limine to Exclude Inadmissible, Irrelevant, and Prejudicial Information/Evidence Concerning Plaintiffs and Dwight Walker
- Motion in Limine No. 2 to Exclude Inadmissible, Irrelevant, and Prejudicial Information/Evidence Concerning Decedent's and Plaintiffs' Criminal History and "bad acts".
- Motion in Limine No. 3 to Limit Testimony of Defense Expert Robert Fonzi

ii.  Defendants have filed 3 motions in limine as follows:

- Motion in Limine No. 1 to Limit Testimony of Plaintiff's Expert Roger Clark
- Motion in Limine No. 2 to Limit Testimony of Plaintiff's Expert Dr. Omalu

- Motion in Limine No. 3 to Exclude Irrelevant and Prejudicial Matters

## V.    BIFURCATION OF ISSUES

Plaintiffs do not oppose bifurcation of the amount of punitive damages into a brief second phase with evidence of Defendants' financial condition limited to that phase.

## VI.    JURY TRIAL DEMANDED

The issues herein are triable to a jury as a matter of right.  The parties made a timely demand for trial by jury.

## VII.    ABANDONMENT OF ISSUES

The parties have discussed stipulating to dismiss certain parties.  At the time that this Memorandum is filed, Plaintiffs will be dismissing Defendant Kramer and Defendant Maldonado from the action.


DATED:  May 20, 2019                    KHASHAN LAW FIRM, APC


_____/s/_____
Lewis Khashan, Esq.,
Attorneys for Plaintiffs Mary Garcia, et al.