TRUJILLO & TRUJILLO, APLC
Robert Trujillo, Esq. (CA SBN 148975)
Melody Trujillo, Esq. (CA SBN 165218)
41593 Winchester Road, Suite 201
Temecula, CA 92590
Tel: 951-296-9529
Email: trulaw@trujillo-law.us

Suzanne Skolnick, Esq. (CA SBN 211076)
2888 Loker Avenue East, Suite 110-F
Carlsbad, CA 92010
Tel: 760-405-4397
Email: suzanne@skolnicklawgroup.com

Lewis Khashan, Esq. (CA SBN 275906)
KHASHAN LAW FIRM
38975 Sky Canyon Drive, Suite 201
Murrieta, CA 9253
Tel: (951) 775-7279
Email:lewis@khashanlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY H. GARCIA, individually and as successor-in-interest to Estate of Phillip Soto Garcia, Jr., (Deceased), et al, <br><br> v. <br><br> SERGEANT AYALA, et al, <br><br><div align="right">Defendants.</div> | CASE NO.: 5:18 CV 839 SJO (ASx) <br><br> PLAINTIFFS' TRIAL BRIEF <br><br><br> Date:  June 25, 2019 <br> Time:  9:00 a.m. <br> Room: 10C |

TO THE HONORABLE COURT, ALL PARTIES HEREIN AND TO THEIR

RESPECTIVE ATTORNEYS OF RECORD:

Plaintiffs hereby submit the following Trial Brief in the above-referenced case.

1

**TABLE OF CONTENTS**

I. SUMMARY OF FACTS ............................................................................ 1

    The Force Used During the Cell Extraction on March 23, 2017 6:34 am ................. 1

    Use of the ERC After the Cell Extraction .................................................. 4

    Transfer from the Sobering Cell to Safety Cell on March 23, 2017 at 6:38am .......... 4

    Transfer to Hospital Detention Unit and Death of Mr. Garcia ................................. 5

    Autopsy Results ................................................................................ 6

    Plaintiffs' Expert Testimony ................................................................... 6

II.    PLAINTIFFS' CLAIMS ........................................................................ 7

    A.  Deliberate Indifference to Medical Needs/Failure to Protect Claims .................. 7

    B.  Excessive Force/Failure to Intervene and Cruel and Unusual Punishment ........ 10

    C.  Integral Participation & Failure to Intervene ........................................... 13

    D.  Interference with Familial Association ................................................. 17

    E.  Causation .................................................................................. 18

    F.  Damages ................................................................................... 20

          i.  Mr. Garcia's Loss of life, Pre-death Pain and Suffering ........................... 20

          ii.  Plaintiffs Angelo and Phillip James' Loss of Their Familial Relationship with Their Father and Plaintiff Mary Garcia's Loss of Relationship with her Spouse ................................................................................ 20

          iii.  Punitive Damages ................................................................... 21

          iv.  Attorneys' fees ...................................................................... 21

1

## **TABLE OF AUTHORITIES**

2

3
Blair v. City of Pomona, 223 F.3d 1074 (9th Cir. 2000)......................................... 17

4
Blankenhorn v. County of Orange, 485 F. 3d 463, (9th Cir. 2007)...................... 14

5
Castro v. County of Los Angeles, 833 F.3d. 1060 (9th Cir.2016) ..................... 8, 9

6

7
Chaudhry v. City of Los Angeles, 751 F.3d 1096 (9th Cir. 2014) ...................... 20

8
Cunningham v. Gates, 229 F.3d 1271 (9th Cir. 2000) ................................. 14, 16

9

10
Cyrus v. Town of Mukwonago, 624 F. 3d 856 (7th Cir. 2010)........................... 18

11
Deorle v. Rutherford, 272 F.3d 1272 (2001) ................................................... 12

12
Drummond v. City of Anaheim, 343 F.3d 1052 (9th Cir. 2003)........................... 17

13

14
Estelle v. Gamble, 429 U.S. 97 (1976) ........................................................... 8

15
Gibson v. County of Washoe, 290 F.3d 1175 (2002).......................................... 8

16
Gordon v. Cty. of Orange, 888 F.3d 1118 (9th Cir. 2018) ........................... 7, 8, 9

17

18
Graham v. Connor, 490 U.S. 386 (1989).......................................................... 10

19
Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir. 1999) ........................... 20

20

21
Johnson v. Duffy, 588 F.2d 740 (1978)............................................................ 14

22
Jones v. Williams, 297 F.3d 930 (9th Cir.2002)................................................ 19

23
Kennedy v. S. California Edison Co., 268 F.3d 763 (9th Cir. 2001) ................... 19

24
Kingsley v. Hendrickson, 135 S. Ct. 2466 (2015)....................................... 10, 11, 12

25

26
Lolli v. County of Orange, 351 F.3d 410 (2003)................................................ 14

27

28

5:18 CV 839 SJO (ASx)

Monroe v. Pape, 365 U.S. 167 (1961) ................................................................ 19

Motley v. Parks, 383 F.3d 1058 (9th Cir. 2004) ............................................... 14

Ovando v. City of Los Angeles, 92 F. Supp. 2d 1011 (C.D. Cal. 2000) ............. 20

Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008) ..................................... 18

Rutherford v. City of Berkeley, 780 F.2d 1444 (1986) ....................................... 15

Sanchez v. Pereira-Castillo, 590 F. 3d 31 (1st Cir. 2009) ............................... 18-19

Smith v. City of Fontana, 818 F.2d 1411 (9th Cir. 1987) ................................... 20

Smith v. City of Hemet, 394 F.3d 689 (2005) .............................................. 16, 17

**Statutes**

42 U.S.C. § 1983 .......................................................................... 9, 18, 19, 20

42 U.S.C. § 1988 ...................................................................................... 21

**Jury Instructions**

Ninth Circuit Manual of Model Jury Instructions No 9.2 .................................... 19

Ninth Circuit Manual of Model Jury Instructions No 9.25 ................................. 11

Ninth Circuit Manual of Model Jury Instructions No 9.31 .................................. 9

# PLAINTIFFS' TRIAL BRIEF

## I. SUMMARY OF FACTS

A full briefing of the facts is contained in Plaintiffs' Memorandum of Law and Contentions of Fact (Docket 95).  On March 22, 2017, Decedent, Phillip Soto Garcia, Jr. ("Mr. Garcia") was a 51 year old pre-trial detainee suffering from a mental health crisis when he was booked into Larry D. Smith Correctional Facility ("LSCF") following his arrest.  At approximately 12:40 p.m. on March 22, 2017, Mr. Garcia arrived at LSCF and was placed in solitary confinement in Sobering Cell #1 for approximately 18 hours before he was forcefully extracted from the cell.

According to the defendants, on the morning of March 23, 2017, while Mr. Garcia was still in Sobering Cell #1, Mr. Garcia was standing atop a three-foot privacy wall in the cell pulling at a ceiling light fixture to the point that it caused his hand to bleed. Defendants also contend that Mr. Garcia was banging his head against the wall of the sobering cell.  Sobering Cell #1 is a small, fully enclosed cell measuring only 12 feet wide by 8 feet deep by 8 feet high.  Sobering Cell #1 shares an adjoining wall to Defendant Sergeant Ayala's office and Defendant Ayala was the on-scene supervisor during the incident.

### The Force Used During the Cell Extraction on March 23, 2017 6:34 a.m.

At approximately 6:34 a.m. on March 23, 2017, Mr. Garcia was violently extracted from Sobering Cell #1 by the Emergency Response Team ("ERT").  The force used during the extraction was excessive and unreasonable and consisted of the use of:  30

5:18 CV 839 SJO (ASx)

rounds of pepperballs fired under the door into the cell in which Mr. Garcia was housed, a stinger grenade which was deliberately thrown directly at Mr. Garcia in the small cell at the direction of Sergeant Ayala, a stun shield which smashed Mr. Garcia in the face, knocking him backward onto the floor of the sobering cell, multiple punches by multiple deputies while on the floor of the sobering cell, a taser, an "attempted" carotid restraint hold, a salivary gland control hold, emergency restraint chair ("ERC") and a spit mask.

The defendants all had time for deliberation before the cell extraction was performed as a briefing occurred lasting a minimum of 10 minutes, during which time the ERT team assembled at the ERT locker, put on their gear and each member of the team was assigned a specific task during the extraction.  It is clear from the Defendants' deposition testimony that none of the Defendants knew anything about the circumstances of Mr. Garcia's arrest (his arresting charges) before commencing the extraction.  It is undisputed that Mr. Garcia was alone in the Sobering Cell when the extraction occurred.

The extraction began when Mr. Garcia's cell was saturated with approximately 30 pepper ball rounds by Defendant Pearson, which was approved by Sergeant Ayala. Thereafter, a stinger grenade was thrown at Mr. Garcia feet on the order of Sergeant Ayala. Sergeant Ayala specifically informed the ERT team where to throw the grenade by identifying Mr. Garcia's position in the small cell beforehand.  The stinger grenade is known as a "maximum effect device". This device delivers up to four stimuli for psychological and physiological effect. It deploys approximately 180 rubber pellets, light, sound and an optional chemical agent. The grenade sprays rubber pellets in a 50-foot

radius and delivers 175 decibels of sound at 5 feet. Product literature for the stinger grenade states that improper use can result in "death or serious bodily injury". The Stinger grenade thrown by Deputy Figueroa detonated within 2 feet from Mr. Garcia. Video of the incident shows that when the stinger grenade exploded, Mr. Garcia attempted to exit the cell **with his hands up on his head**. Defendant Caverley testified at deposition that Mr. Garcia had his "hands up", "near his head" when he crossed the plane of the cell door.  Nevertheless, Defendant Lopez charged forward and smashed Mr. Garcia in the face with the stun shield, knocking him violently to the ground, whereupon he was aggressively piled upon by several deputies.

The defendants' all prepared "Use of Force Reports". The reports provide that the force used against Mr. Garcia by each defendant is as follows: Deputy Bergert's use of force report indicates that he used the force of his body weight and punched Mr. Garcia in the head with his closed fist several times; Deputy Caverley reported that he used the force of his body weight on top of Mr. Garcia; Deputy Cordero indicated he punched Mr. Garcia with his closed fist on the left side of Mr. Garcia's abdomen at least 3 times and used the force of his body weight on Mr. Garcia's body to hold him down; Deputy Hinson testified and reported that he punched Mr. Garcia at least 4-5 times on the right side of his face and back with his closed fist while Mr. Garcia was tackled to the ground by several other deputies; Deputy Hinson also attempted to apply a carotid restraint hold; Deputy Lopez reported that he used the Stun Shield and used the force of his body weight atop of Mr. Garcia in addition to the weight of the other deputies. Deputy Rodarte-Lugo stated

that he used his body weight on Mr. Garcia and also pinned Mr. Garcia down by his legs while Deputy Figueroa tased Mr. Garcia at the same time.

### Use of the ERC After the Cell Extraction

While Mr. Garcia was being strapped to the ERC, Deputy Hinson also punched Mr. Garcia at least four times on the right side of his abdomen with his closed fist. While Mr. Garcia was handcuffed and being strapped to the ERC, Defendant Steele punched Mr. Garcia three (3) times in the head, and then also applied a salivary gland control hold to Mr. Garcia while Mr. Garcia's legs were being strapped to the ERC.  Deputy Llanos testified and reported that he used the force of his body weight to secure Mr. Garcia to the ERC and used control holds against Mr. Garcia. These control holds are known to cause pain and submission by the inmate.

### Transfer from Sobering Cell to Safety Cell on March 23, 2017 at 6:38 a.m.

After the extraction, while Mr. Garcia was restrained to the ERC with his hands hand-cuffed behind his back and all four of his limbs tied down, he was then shoved in the ERC into Safety Cell #3 across the hallway from the sobering cell.  Mr. Garcia remained bound in the chair, without adequate hydration or food or basic human care for approximately 3 hours. During that time, although jail policy required deputies to untie one limb for range of motion exercises every 30 minutes, all four of Mr. Garcia's limbs remained bound.

Notably – despite Defendants' assertions that Mr. Garcia was seen in the safety cell at 6:38 a.m and 6:40 a.m. on March 23, 2017 by medical and mental health staff – **video**

1   **of Mr. Garcia in the Safety Cell from the time of his first entry into the cell clearly**

2   **shows that the door to the cell does not even open until 1 hour and 14 minutes after**

3

4   **Mr. Garcia entered the safety cell.**

5                    <u>**Transfer to Hospital Detention Health Unit and Death of Mr. Garcia**</u>

6

7          Mr. Garcia was eventually transported to Riverside University Health Services

8   ("RUHS"), still in the ERC with waist and ankle shackles applied and a spit mask

9   covering his face at approximately 9:40 a.m. on March 23, 2017. Mr. Garcia's admitting

10  diagnosis when he arrived at RUHS was rhabdomyolysis (which is the rapid destruction

11  of skeletal muscle) and acute kidney injury ("AKI"), neither of which he had when he left

12

13  Desert Regional Medical Center and entered the jail.  At the hospital, Mr. Garcia

14  remained continuously restrained in 4-point restraints from the time of his arrival at the

15  hospital on March 23, 2017 at approximately 10:40 a.m. to the time of his death on March

16

17  24, 2017 at approximately 3:06 a.m.  Mr. Garcia remained in the ERC for a total of

18  approximately 7 hours (3 at the jail and 4 at the hospital), perhaps even longer, which

19  violates jail policy. Thereafter he was transferred onto a hospital gurney at approximately

20

21  1:21 pm on March 23, 2017. Even after being transferred to the hospital gurney and later

22  to a hospital bed, all of Mr. Garcia's limbs remained completely restrained, without range

23  of motion exercises ever being performed. Plaintiffs contend that Mr. Garcia died on

24

25  March 24, 2017 at 3:06 a.m. at RUHS as a direct result of the excessive force used against

26  Mr. Garcia while at the jail and as a result of Defendants' deliberate indifference to Mr.

27

28  Garcia's medical and mental health needs.

**<u>Autopsy Results</u>**

The cause of death on Mr. Garcia's death certificate remained as "pending" for approximately one year after his death.  An amendment to the death certificate was issued in 2018. The Amendment to the Death Certificate listed the cause of death as follows: (a). Sudden death in schizophrenia; (b). Rhabdomyolysis in association with physical exertion by subject and application of control methods; (c). Seizure disorder; (d). Hypertensive cardiovascular disease; (e) Homicide (f). Self-initiated physical exertion with control methods applied by law enforcement while in custody.

**<u>Plaintiffs' Expert Testimony</u>**

Plaintiffs' medical expert, Dr. Bennet Omalu concluded that Mr. Garcia died as a result of Hypoxic-Ischemic Cerebral Injury due to Combined and Sustained Chemical-Mechanical-Positional Restraint Asphyxiation. Metabolic Encephalopathy and Traumatic Brain Injury due to Blunt Force Trauma of the head were contributory factors to his death. All of the foregoing relates back to the force used against Mr. Garcia by the defendant deputies during their extraction in addition to the failure of the defendants to obtain adequate medical and mental health treatment for Mr. Garcia in a timely manner.  The Coroner, Dr. McCormick determined that the "manner" of death was a homicide.

Expert testimony will conclude that Mr. Garcia suffered a brain injury in addition to other ongoing trauma which cumulatively contributed and ultimately caused his death. The totality of the actions/inactions taken by each individual defendant contributed to the ultimate tragic death of Mr. Garcia. Each defendant had a duty to intervene and prevent

the ongoing brutality and inhumane treatment of Mr. Garcia but failed to do so.  Mr. Garcia's suffering never ended until his passing.

## II.  PLAINTIFFS' CLAIMS

Plaintiffs bring the following claims against Defendants:

1.  First Claim for Relief – Deliberate Indifference to Medical Needs

2.  Second Claim for Relief – Wrongful Death/Cruel and Unusual Punishment

3.  Third Claim for Relief – Interference with Familial Right of Association

4.  Fourth Claim for Relief – Excessive Force

5.  Fifth Claim for Relief – Failure to Intervene to Stop Excessive Force

6.  Sixth Claim for Relief – Failure to Protect/Cruel and Unusual Punishment

Each of the foregoing claims and the elements necessary to prove the claim are thoroughly discussed in Plaintiff's Memorandum of Law and Contentions of Fact (Docket 95). However, additional briefing appears below to assist the Court regarding differences between the parties regarding what elements Plaintiffs must prove on these claims.

### A.  Deliberate Indifference to Medical Needs/Failure to Protect Claims

Plaintiffs do not have a state law "failure to summon or furnish medical care" claim against Defendants in this action. Plaintiffs' claims are for failing or delaying in providing adequate medical/mental health care and for failing to protect Mr. Garcia from harm. Defendants repeatedly, throughout briefing and in their proposed jury instruction and verdict form, focus only on <u>summoning</u> emergency medical care. That is not the legal standard for Plaintiffs' Fourteenth Amendment claims. See <u>Gordon v. County of Orange</u>,

888 F.3d 1118, 1124-25 (9th Cir. 2018); <u>Castro v. County of Los Angeles</u>, 833 F.3d. 1060, 1069-71 (9th Cir.2016).

Defendants owed Mr. Garcia the duty, under the Fourteenth Amendment to provide for his serious medical needs.  Neither Mr. Garcia, nor his family were in any position to provide for his needs.  <u>Gibson v. County of Washoe</u>, 290 F.3d 1175 (9th Cir. 2002), cert. denied, 537 U.S. 1106 (2003).  Deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain". <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976). The <u>Estelle</u> court held that "…[t]his is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care…" <u>Estelle v. Gamble</u>, supra, at 104–05.

To hold Defendants liable, Plaintiffs must prove:  (i)The defendant made an intentional decision with respect to the conditions under which Phillip Soto Garcia, Jr. was confined (namely, the medical/mental health treatment that was not provided to Phillip Soto Garcia, Jr.); (ii) Defendant's decision put Phillip Soto Garcia, Jr. at substantial risk of suffering serious harm; (iii) Defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious; and (iv) By not taking such measures, the defendant caused Phillip Soto Garcia, Jr.'s injuries.  See Ninth Circuit Manual of Civil Jury Instructions No. 9.30 Comment, and <u>Gordon v. Cty. of Orange</u>, 888 F.3d 1118, 1125 (9th Cir. 2018)

5:18 CV 839 SJO (ASx)

(holding that an objective reasonableness standard applies).  The elements of a deliberate

indifference claim under § 1983 are virtually identical to Plaintiffs' Sixth Claim for

Failure to Protect.  See Ninth Circuit Manual of Civil Jury Instructions No. 9.31; Castro v.

County of Los Angeles, 833 F.3d. 1060, 1070 (9th Cir.2016) (en banc).

      Nowhere in the foregoing list of elements is the term "summon" even used.

Defendants are improperly interjecting California Government Code § 845.6 into the

elements of the claim. Govt. Code § 845.6 provides that an employee can be liable when a

prisoner "is in need of immediate medical care" and the employee "fails to take reasonable

action to summon medical care".  The elements of a § 1983 deliberate indifference claim

are clearly set forth in the Gordon v. Cty. of Orange,supra at 1125 case and should be used

in this case.  The elements of a § 1983 failure to protect (conditions of confinement) claim

are clearly set forth in 9th Circuit Model Jury Instruction 9.31 and should be used in this

case.

      Here, the deliberate indifference claim against Defendants is based on their failure

to obtain medical and psychiatric care (or delay in obtaining the same), in violation of

policy, when the need for such care was obvious both before and after the cell extraction.

Additionally, the mode and manner in which Mr. Garcia was kept (without food, water

and range of motion) was also objectively unreasonable, thus Defendants failed to protect

Mr. Garcia from a substantial risk of suffering serious harm.  Before the cell extraction

commenced, the defendants either observed or had been informed that Mr. Garcia was

banging his head against the cell wall and yet, none of them called for medical or mental

health staff to evaluate Mr. Garcia. The medical office was only about 20 to 30 feet from the sobering cell. Sergeant Ayala's office shared an adjoining wall to the sobering cell. Due to Mr. Garcia's obvious mental disturbance, Defendant Sergeant Ayala believed Mr. Garcia needed to be moved to the safety cell. But he never requested (nor did any other defendant) that Mr. Garcia be seen by any mental-health or medical worker, and instead issued the order to commence a violent cell extraction.

Even after the cell extraction, although all of the defendants involved in the cell extraction were aware that Mr. Garcia had suffered multiple blunt force trauma to his head and body, along with being tased, they placed him in the safety cell where **no one even opened the door for a period of 1 hour and 14 minutes after his entry into the cell**. Throughout that time, no range of motion exercises were performed, no hydration was provided and no food, all of which were in violation of jail policy. Moreover, there is no record of any food being provided to Mr. Garcia in the 18 hours when he was in the sobering cell.

### B. Excessive Force/Failure to Intervene and Cruel and Unusual Punishment

"It is clear … that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." Graham v. Connor, 490 U.S. 386, 395 n.10 (1989). In Kingsley v. Hendrickson, 135 S. Ct. 2466, 2472 (2015), the Supreme Court held that to prove an excessive force claim under the Fourteenth Amendment, a pretrial detainee must show that the officers' use of force was "objectively" unreasonable; the detainee is not required to show that the officers were "subjectively" aware that their

use of force was unreasonable.  Factors to consider in determining whether the defendant

used excessive force include, among others:

> (1) the circumstances known to the officers at the time force was applied;
> (2) whether Mr. Garcia posed an immediate threat to the safety of the officers or to others;
> (3) whether Mr. Garcia was actively resisting;
> (4) the amount of time the officer had to determine the type and amount of force that reasonably appeared necessary, and any changing circumstances during that period;
> (5) the type and amount of force used;
> (6) the availability of alternative methods to subdue Mr. Garcia;
> (7) whether it was practical for the officers to give warning of the imminent use of force, and whether such warning was given;
> (8) whether it should have been apparent to the officers that the person they used force against was emotionally disturbed;
> (9) the risk of injury posed by the type of force used; and
> (10) whether the officers attempted to deescalate the situation prior to or during the use of force.
> Additional Factors to Consider are:
> (11)  the relationship between the need for the use of force and the amount of force used;
> (12)  the extent of Mr. Garcia's injuries;
> (13)  any effort made by the officer to temper or to limit the amount of force;
> (14)  the severity of the security problem at issue; and
> (15)  the threat reasonably perceived by the officer.

(See Ninth Circuit Manual of Model Jury Instructions No 9.25 and <u>Kingsley v.</u>

<u>Hendrickson</u>, 135 S. Ct. 2466, 2472 (2015)).

   Here, Mr. Garcia was alone and confined to his own jail cell when the extraction

began.  He did not pose a threat to any of the deputies, staff or other inmates because he

was in solitary confinement.  Mr. Garcia had no control over the situation.  The

defendants had control over the situation and in fact, had time to plan the cell extraction

during a briefing before it occurred.  There was no exigency to the circumstances, and as

such, no need for force.  Every defendant knew, even prior to the pepperballs being deployed that Mr. Garcia was banging his head against the cell wall before the cell extraction.  Thus, it should have been obvious that he suffered from a mental health condition that required treatment.

Deorle v. Rutherford, (2001 9th Cir.) 272 F.3d 1272, 1282-1283 held that "the problems posed by and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance" are ordinarily different from those problems and tactics that are relevant to a dangerous and armed criminal.  Id. In fact, the 9th Circuit counsels that "[i]n the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. Id. at 1283.  Here, rather than perform a violent cell extraction against an unarmed inmate who was no risk to staff or others while being held in solitary confinement, defendants could have summoned a mental health professional to talk to Mr. Garcia before resorting to force.  A review of the other factors also shows that on balance, the quality and nature of the intrusion far outweighed the governmental interest at stake.

*The extent of the plaintiff's injury*  - Plaintiffs' medical expert will opine that Mr. Garcia died as a result of Defendants' various uses of force.  The autopsy report indicates that Mr. Garcia suffered massive injuries over his entire body.

*Any effort made by the officer to temper or to limit the amount of force* – This Kingsley factor also weighs heavily in favor of Plaintiff because the cell extraction was

planned ahead of time in a briefing that lasted at least 10 minutes.  Defendants had ample

time to reflect on what methods of force would be used before escalating to the next level.

The taser paralyzed the muscles throughout Mr. Garcia's body, rendering him limp and

helpless – yet the force did not stop.

*The severity of the security problem at issue* – Mr. Garcia was one, single unarmed

man in solitary confinement.  His conduct did not pose a risk to other inmates or staff.

*The threat reasonably perceived by the officer* –None of the defendants could

reasonably have perceived Mr. Garcia to be a threat before the cell extraction began

because he was confined alone in the cell and was unarmed.  Moreover, once the cell

extraction commenced, Defendants could not have perceived Mr. Garcia to be a threat

because (a) they greatly outnumbered him; (b) they were armed, whereas Decedent was

unarmed; (c) once Mr. Garcia was handcuffed he would not have been able to punch any

of the Defendants; (d) once Mr. Garcia was handcuffed and placed in the ERC with all

four limbs restrained, he had no ability to move his limbs altogether.

*Whether the plaintiff was actively resisting* – After the stinger grenade was

detonated, the deputies swarmed him at the cell door and pinned him to the ground.  The

weight of at least 6 deputies was on him and he was pinned face first to the ground with a

stun shield.  He was then also tased, which resulted in gaining his compliance to be

handcuffed. His initial resistance in refusing to be handcuffed did not warrant such a

violent extraction and the continued application of force against him.

## C.  Integral Participation & Failure to Intervene

Under longstanding precedent, each Defendant is liable not only for violations of rights he caused by his own conduct, but also for violations of rights by others which he set in motion, where he reasonably should have known his conduct would cause others to inflict the injury. Johnson v. Duffy, 588 F.2d 740, 743–44 (9th Cir. 1978) ("The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.").

Integral participation does not require that each officer's actions themselves rise to the level of a constitutional violation. (Blankenhorn v. County of Orange, 485 F. 3d 463, 481 n. 12 (9th Cir. 2007); Motley v. Parks, 383 F.3d 1058, 1071 (9th Cir. 2004). "Pursuant to a long line of civil cases, police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." (Cunningham v. Gates, 229 F.3d 1271, 1289-90 (9th Cir. 2000) (recognizing officers' duty to intercede where they have an opportunity to stop a violation of rights)).

In Lolli v. County of Orange, 351 F.3d 410, 417-18 (9th Cir. 2003), all of the officers who had physical contact with the plaintiff were integral participants in the jail beating, even though the plaintiff could not identify exactly which officer delivered which use of force:

> Even though Lolli has not been able to identify precisely which officer delivered which alleged blow or use of force, he has developed and presented sufficient evidence from which a jury could infer that the individual officers

> who had physical contact with Lolli participated in the alleged beating. Lolli has done more than simply place the officers at the scene of the altercation and assert a group liability theory. . . . Instead, he has properly relied on the deputies' own admissions that they were involved in the altercation and that they exerted some physical force on him to create the necessary inference that the deputies were 'integral participants' in the alleged unlawful act.

Id. at 417 (citations omitted).  See also Rutherford v. City of Berkeley, 780 F.2d 1444 (9th Cir. 1986) (jury could infer that defendant officers participated in beating where they were among several officers surrounding him, but plaintiff could not identify who punched or kicked him).

Defendants mischaracterize that several of the Defendant deputies did not use any force against Mr. Garcia and thus, presumably, conclude that those defendants cannot be held liable for excessive force.  Defendants are incorrect.  With the exception of Kramer and Maldonado who Plaintiffs are dismissing, each one of the Defendants used force or were integral participants in the use of force.  For example, Defendant Sergeant Ayala planned the extraction, ordered the Defendants where to throw the grenade and can be seen adjusting some type of strap on Mr. Garcia while the other defendants are tying him to the ERC.  Defendant Tesillo continued to maintain Mr. Garcia in the ERC long after he was taken to the hospital and for lengthy periods of time with a spit mask on, notwithstanding that no one was in the room where Mr. Garcia was being kept.  As for Defendant Caverley, he secured the waist and shoulder straps of the ERC on Mr. Garcia immediately after the cell extraction.  Use of the ERC is also a use of force – it is essentially a full body control hold.  Moreover, given the totality of the circumstances

wherein Mr. Garcia had already been beaten by several deputies, tased, and was at that point compliant, handcuffed and not resisting – use of the ERC on Mr. Garcia was objectively unreasonable.  Defendants Llanos, Miranda and Tarango also used the ERC on Mr. Garcia while he was in the safety cell.

In light of this Circuit's precedent, it would be improper to try to parse out and separately evaluate in a vacuum each admitted use of force—especially when the court and jury must consider "the totality of force used." Smith v. City of Hemet, 394 F.3d 689, 703-704 (9th Cir. 2005) (en banc).

When officers collectively violate their duty to intervene, the Ninth Circuit has not hesitated to call it what it is—the Code of Silence:

> The seriousness of such a custom and the need of a civil rights remedy for it is underlined by what has been observed around the country as to the code of silence in police departments. E.g., Thomas v. City of New Orleans, 687 F.2d 80 (5th Cir. 1982); White-Ruiz v. City of New York, 983 F. Supp. 365, 379 (S.D.N.Y. 1997); Douglas L. Colbert, Bifurcation of Civil Rights Defendants: Undermining Monell in Police Brutality Cases, 44 Hastings L.J. 499, 550, n.271 (1993). The thorough examination of police practices in Los Angeles after the beating of Rodney King by uniformed police officers described the **officers' "code of silence" as consisting in a single rule: "an officer does not provide adverse information against a fellow officer."** Report of the Independent Commission on the Los Angeles Police Department, 168 (1991) (the Christopher Commission Report). According to the Christopher Commission, all police officers adhere to this rule, even good ones. It is a formidable barrier to the investigation of complaints about the police. See Id. The Commission cited instances where officers were officially punished for breaking the code. See Id. at 170. We take judicial notice of the report. See, e.g., Heliotrope General, Inc. v. Ford Motor Co., 189 F.3d 971, 981 n.18 (9th Cir. 1999); Barron v. Reich, 13 F.3d 1370, 1377 (9th Cir. 1994); Fed. R. Evid. 201(c). The code of silence has been found to continue in Los Angeles despite the findings and recommendation of the Christopher Commission. See Cunningham v. Gates, 989 F. Supp. 1262, 1267 (C.D. Cal. 1997).

<u>Blair v. City of Pomona</u>, 223 F.3d 1074, 1081 (9th Cir. 2000) (emphasis added).

Strong evidence of this code of silence exists in this case.  Here, several of the Defendants deny seeing any of their fellow deputies punching Mr. Garcia while he was simultaneously being subjected to other uses of force on the floor of the sobering cell, or when Mr. Garcia was handcuffed in the ERC, despite the fact that many of the deputies were within inches of each other while the punches were occurring.  Moreover, Sergeant Ayala can be seen just a few feet away from Deputy Steele and Hinson when they punch Mr. Garcia while he is handcuffed and restrained to the ERC.

Each of the Defendants participated in the cell extraction and the use of force post-cell extraction either personally or as an integral participant. The en banc Ninth Circuit requires consideration of "the totality of force used." <u>Smith</u>, supra, 394 F.3d at 703–704. In <u>Drummond v. City of Anaheim</u>, 343 F.3d 1052 (9th Cir. 2003), cert. den. 542 U.S. 918 (2004) where two officers placed their weight on an emotionally disturbed detainee's neck and torso as he lay on the ground—much less than the collective force applied here—the Court found such force was "severe and, under the circumstances, capable of causing death or serious injury." <u>Id.</u> at 1056–57.  Each Defendant here also failed to intervene to stop the others' uses of unlawful force against Mr. Garcia.  All Defendants are thus liable for all excessive force used in this incident.

### D.  Interference with Familial Association

The applicable liability standard for a familial-association claim under the

Fourteenth Amendment is "shocks the conscience."  Porter v. Osborn, 546 F.3d 1131, 1136–39 (9th Cir. 2008).  Where the claim flows from defendants' conduct in an urgent situation, this standard is satisfied where the jury finds that the defendant "acted with a purpose to harm [the decedent] that was unrelated to legitimate law-enforcement objectives."  Id. 4.  Where there is time for deliberation, such as where claims arise from alleged indifference to an inmate's serious medical needs, the "shocks the conscience" standard is satisfied by showing the defendants acted with "deliberate indifference."  Id. at 1139 ("At the other end of the spectrum are situations, like the Eighth Amendment prison cases … where extended opportunities to do better are teamed with protracted failure even to care.") (citations omitted).  This is the same standard for all claims related to Defendants' failure to provide for Mr. Garcia's serious medical needs.  On the excessive force claim, a deliberate indifference standard should also apply because there was ample time for deliberation during the 10 minute+ briefing that occurred before the cell extraction, along with the time the Defendants had to deliberate before using force (salivary gland holds) while Mr. Garcia was in the safety cell and restrained to the ERC.

### E.   Causation

Defendants repeatedly ignore concurrent causation principles in their briefing and proposed jury instructions. Federal courts have found that proximate cause under §1983 incorporates common-law tort causation principles.  Cyrus v. Town of Mukwonago, 624 F. 3d 856, 864 (7th Cir. 2010) (common-law tort causation rules apply to 1983 claims; general rule is that expert testimony is not necessary to prove causation); Sanchez v.

Pereira-Castillo, 590 F. 3d 31, 50 (1st Cir. 2009) (common law tort causation principles apply under 1983; causal connection may consist of state actor setting in motion series of acts by others which state actor knows or reasonably should know would cause others to inflict constitutional injury); This position is consistent with the Supreme Court's direction and 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Monroe v. Pape, 365 U.S. 167, 187 (1961).

Additionally, many factors or things or the conduct of two or more persons can operate at the same time either independently or together to cause injury or damage. In such a case, the conduct of each factor, thing, or person is a cause of the injury regardless of the extent to which each contributes to the injury. (See, Ninth Circuit Manual of Model Civil Jury Instructions, Instruction No. 9.2 (Comment); Jones v. Williams, 297 F.3d 930, 937 n.6 (9th Cir.2002). Kennedy v. S. California Edison Co., 268 F.3d 763, 768 (9th Cir. 2001) (discussing jury instruction for concurrent causes under California tort law:

> "There may be more than one cause of an injury. When conduct of two or more persons or conduct and a defective product contributes concurrently as causes of an injury, the conduct of each is a cause of the injury regardless of the extent to which each contributes to the injury.")

Here, Plaintiffs contend that Defendants' combined use of excessive force caused Mr. Garcia severe injury and ultimately, death. Additionally, Defendants' deliberate indifference to Mr. Garcia's serious medical needs resulted in further deprivations including – additional concussive injuries, lack of hydration, food and range of motion

exercises, all of which contributed to Mr. Garcia's death.

### F.  Damages

#### i.  Mr. Garcia's Loss of life, Pre-death Pain and Suffering

Federal claims belonging to the Decedent may be pursued by his estate following his death as a survival action. See <u>Smith v. City of Fontana</u>, 818 F.2d 1411, 1416 (9th Cir. 1987), overruled on other grounds by <u>Hodgers-Durgin v. de la Vina</u>, 199 F.3d 1037 (9th Cir. 1999). Plaintiffs seek compensation for the intense pain, suffering and mental anguish Mr. Garcia suffered during the period leading up to his death and for his loss of life.  (See <u>Chaudhry v. City of Los Angeles</u>, 751 F.3d 1096, 1105 (9th Cir. 2014) (pre-death pain and suffering recoverable in § 1983 action).  Mr. Garcia spent his last hours of life in pain being beaten and unreasonably restrained without adequate food, hydration or basic human decency.

#### ii.  Plaintiffs Angelo and Phillip James' Loss of Their Familial Relationship with Their Father and Plaintiff Mary Garcia's Loss of Relationship with her Spouse.

Each of the plaintiffs have a Fourteenth Amendment due process claim based on the deprivation of their relationship with their father/spouse.  (See, <u>Ovando v. City of Los Angeles</u>, 92 F. Supp. 2d 1011, 1018 (C.D. Cal. 2000); <u>Smith v. City of Fontana</u>, 818 F.2d 1411, 1418 (9th Cir.1987), overruled on other grounds by <u>Hodgers-Durgin v. de la Vina</u>, 199 F.3d 1037, 1041 n.1 (9th Cir. 1999) ("constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents.")  Mr. Garcia's death was tragic and premature. He

5:18 CV 839 SJO (ASx)

was only fifty-one (51) years old and would have lived for many more years absent the Defendants' constitutional violations.  Each of the Plaintiffs have suffered emotional distress over the loss of their loved one and the fact that they have been deprived of approximately 28.9 years of a familial relationship with Mr. Garcia.

### iii.  Punitive Damages

Based on the conduct described above, Plaintiffs contend that the individual defendants' conduct was malicious, oppressive, and in reckless disregard of Mr. Garcia's rights, giving rise to punitive damages.

### iv. Attorneys' Fees

Attorneys' fees are allowed to a prevailing plaintiff pursuant to 42 U.S.C. § 1988.

Respectfully submitted,

Dated: June 11, 2019

/s/Suzanne Skolnick
Attorney for Plaintiffs, Mary
Garcia, et al.

5:18 CV 839 SJO (ASx)